******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# SEMAC ELECTRIC COMPANY, INC. *v.* SKANSKA USA BUILDING, INC.
## (AC 41054)

Alvord, Devlin and Norcott, Js.

*Syllabus*

The plaintiff subcontractor, E Co., sought to recover damages from the defendant, S Co., for, inter alia, breach of contract in connection with a dispute arising from a project relating to the expansion and renovation of a hospital. Pursuant to its contract with S Co., E Co. agreed to perform all electrical work for the project. The contract provided that E Co. had a duty to coordinate with S Co., that E Co. had made allowances for all hindrances and delays to its work, and that E Co. would work within S Co.'s schedule, which S Co. may revise from time to time. S Co. had the right to direct a change in E Co.'s work on written notice and, during the course of the project, thirty-eight change orders were issued. After several months, E Co. sent S Co. a notice, alleging a cardinal change to the contract due to issues that arose during the preceding months and asserting that it could only continue to perform under the contract if S Co. agreed to additional financial terms. S Co. responded that E Co.'s refusal to proceed under the contract constituted default and, the next day, S Co. terminated E Co. E Co. alleged that S Co. had breached the contract by its wrongful termination of E Co., and S Co. filed a counterclaim, alleging, inter alia, breach of contract. S Co. also filed a third-party complaint against K and T, the chief financial officer and president of E Co., respectively, alleging, inter alia, fraudulent conduct. The case was tried to the court, which rendered judgment in part for S Co. on its counterclaim, and in favor of K and T on the third-party complaint. On S Co.'s appeal and E Co.'s cross appeal to this court, *held:*

1. The trial court properly rejected E Co.'s claim that there had been a cardinal change in the contract terms and properly concluded that E Co. breached the contract by abandoning the project: the court properly focused on the nature and impact of the delays on the work expected of and performed by E Co., which were not extraordinary in a project of this magnitude, and neither the character nor the nature of the work expected of or performed by E Co. was altered in any way, and E Co. was compensated for the changes in its work up until the time that it issued its notice of cardinal change to S Co., E Co. was required to anticipate unforeseen modifications to E Co.'s sequence of construction and the schedule parameters of the contract when it signed the contract, as the contract language demonstrated that the parties contemplated the possibility of scheduling delays and changes; moreover, there was no evidence that the change orders altered the nature of E Co.'s work, and, in executing each change order, E Co. attested that it was compensated for associated costs and delays, and it was clear that the changes were not so profound that they were not redressable under the contract, as they were, in fact, redressed via the change orders.

2. The trial court properly concluded that S Co. materially breached its contract with E Co. by failing to provide E Co. with a forty-eight hour cure period before terminating its contract with E Co.: even though S Co. claimed that the court erred in assuming that it had terminated E Co. pursuant to the contract provision requiring it to give E Co. forty-eight hours to cure its breach, because S Co. pleaded in its counterclaim that it had declared E Co. in default pursuant to the contract, the court properly held the parties to their contractual obligations; moreover, S Co.'s reliance on certain common-law principles overlooked the clear contractual language requiring a cure period, which did not include any exceptions, and which outlined the procedure if E Co. abandoned the project or defaulted on its obligations and the court correctly determined that S Co. should be held to the contract provisions because to hold otherwise would excuse S Co.'s noncompliance with the contract and would create a new and different agreement, which courts cannot do; furthermore, the court's enforcement of the cure period did not render meaningless another provision of the contract stating that S Co.'s con-

tractual remedies were not exclusive, because S Co. could not turn to the common law to avoid an express contractual obligation.

3. The trial court's award of damages was not erroneous: this court disagreed with S Co.'s claim that, due to E Co.'s material breach, S Co. was excused from further performance of its contractual obligations and was entitled to expectation damages, because S Co. also breached the contract by failing to afford E Co. a forty-eight hour cure period, transforming its termination for cause of E Co. into a termination for convenience and, accordingly, S Co. could not claim entitlement to a common-law remedy after forfeiting its right to a contractual remedy as a result of its own breach; moreover, E Co. could not prevail on its claim that the court erred in not awarding a termination payment pursuant to the contract, because, although the court concluded that E Co. was entitled to a termination payment, the court found that E Co.'s billing practices were too irregular to award damages on the basis of its invoices, which the contract had provided for, and, instead, calculated the payment by determining the percentage of the project E Co. had completed and multiplying that percentage by the contract price; although potentially imprecise, it could not reasonably be argued that this method ran afoul of the contract or was unfair to E Co.

4. The trial court did not err in finding that K and T did not commit fraud when they swore under oath to the accuracy of invoices submitted to S Co. for goods and services they represented to S Co. that they had paid to other subcontractors, but actually never did pay; K's and T's conduct strained the bounds of fraud, revealing, at best, gross incompetence, but the court nevertheless found that, on the basis of its observation of K's and T's demeanor and attitude, neither K nor T acted with fraudulent intent, and this court does not second-guess the court's credibility assessments.

Argued October 16, 2019—officially released February 11, 2020

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Hartford, Complex Litigation Docket, where the defendant filed a counterclaim; thereafter, the court, *Young, J.*, granted the defendant's motion to implead Kevin Pope et al. as third-party defendants, and the defendant filed a third-party complaint against the third-party defendants; subsequently, the court, *Moukawsher, J.*, dismissed the defendant's claims of defamation and tortious interference, and the matter was tried to the court, *Moukawsher, J.*; judgment in part for the defendant on the counterclaim and judgment for the third-party defendants on the third-party complaint; thereafter, the court granted the defendant's motion for prejudgment interest, and the defendant appealed and the plaintiff cross appealed to this court. *Affirmed.*

*Bruce Meller*, pro hac vice, with whom were *Michael J. Donnelly*, *Kevin W. Munn* and, on the brief, *Eric B. Miller*, for the appellant-cross appellee (named defendant).

*Louis R. Pepe*, with whom was *Laura W. Ray*, for the appellee-cross appellant (plaintiff).

*Richard P. Weinstein*, with whom, on the brief, was *Sarah Black Lingenheld*, for the appellees (defendant Kevin Pope et al.).

*Opinion*

DEVLIN, J. In this action arising from the expansion and renovation of Stamford Hospital (hospital), both parties, the plaintiff, Semac Electric Company, Inc. (Semac), and the defendant, Skanska USA Building, Inc. (Skanska), appeal from the judgment of the trial court, challenging the court's determinations that they both breached the contract between them, and awarding Skanska damages in the amount of $3,857,130.77,[1] as reimbursement for funds that Skanska had overpaid to Semac for work that Semac had not performed. Skanska also claims that the trial court erred in finding that the individual third-party defendants, Kevin Pope and Thomas Scanlon, the chief financial officer of Semac and the president of Semac, respectively, did not engage in fraudulent conduct when they signed, under oath, invoices misrepresenting that Semac had paid other subcontractors for certain goods and services. We affirm the judgment of the trial court.

The trial court set forth the following relevant facts. As the general contractor retained by the hospital to serve as the construction manager for the construction of a new building on its existing campus (project), Skanska entered into a subcontract with Semac, dated March 5, 2014, pursuant to which Semac agreed to perform all necessary electrical work on the project for the sum of $14,785,462. On October 19, 2015, after working for several months on the project, Scanlon delivered to Skanska a "Notice of Cardinal Change and Material Breach of Subcontract" (Notice of Cardinal Change), wherein Semac stated: "[T]here has been a cardinal change to our subcontract due to the drastic and unforeseen modifications and changes that have been made to Semac's sequence of construction and the schedule parameters set forth in the subcontract, which has unreasonably altered the character of the work and unduly increased its cost." In the multipage letter, Semac identified several specific issues that arose during the preceding months of construction, and asserted: "As a result of the cumulative effect and the severe magnitude and quality of the scheduling and sequencing delays and disruptions and other assumptions contemplated by the subcontract, the entire nature of the electrical work for this [p]roject is something totally different than anyone reasonably anticipated or contemplated at the time of entering into a subcontract." Semac asserted that it could continue to perform under the subcontract only if Skanska agreed to an increase in the contract price, and to certain additional financial terms. Semac concluded: "We trust that . . . Skanska will work with us to reach this equitable solution. Otherwise, Semac will be excused from further performance and cease work as of October 23, 2015, in which case we would seek compensation for all work performed through that date."

In response, on October 21, 2015, Skanska advised Semac that its refusal to proceed under the terms of the subcontract constituted a default under that contract, and that, if Semac failed to cure the default, Skanska would pursue its contractual rights.

The next day, on October 22, 2015, Skanska terminated Semac, and notified Semac that it was taking possession of Semac's "materials, tools, appliances, equipment and other items." (Internal quotation marks omitted.) In turn, Semac accused Skanska of material breach of the subcontract on the ground of wrongful termination.

On October 23, 2015, Semac commenced this action. In its second amended complaint, Semac alleged that Skanska had materially breached the contract by virtue of the cardinal changes of which it had given Skanska notice on October 19, 2015, failing to make monthly progress payments for work completed by Semac, failing to compensate Semac for additional work that was performed by Semac and was not required by the original contract, and failing to pay the overtime premium required by Semac to complete that work. Semac claimed that Skanska had wrongfully terminated it and confiscated its tools and equipment. In addition to the breach of contract and wrongful termination counts, Semac alleged causes of action sounding in quantum meruit, breach of the implied covenant of good faith and fair dealing, violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et. seq., conversion, and civil theft. Semac sought monetary damages, including statutory interest and attorney's fees pursuant to General Statutes § 42-158j, and declaratory relief.

Skanska essentially denied all of Semac's allegations, and asserted multiple special defenses, asserting that Semac waived many of its claims by, inter alia, failing to submit claims for overtime premiums and accepting payment for the work completed and failing to comply with the dispute resolution provisions of the contract. Skanska also filed a counterclaim alleging that Semac breached the contract by failing to perform and complete the work and effectively abandoning performance, and committed fraud and civil theft by submitting billing to Skanska for work that it had not performed and goods that it had not procured.[2] Finally, Skanska claimed a "setoff," alleging: "To the extent that Semac is entitled to damages from Skanska, Skanska is entitled to set off for the amount of loss or damages sustained as a result of Semac's actions."

Semac denied all of Skanska's special defenses and the essential allegations of Skanska's counterclaim. Semac asserted multiple special defenses to Skanska's counterclaim, the most pertinent of which was its allegation that Skanska's claims were barred by its own

material breach of the contract. Like Skanska, Semac alleged: "To the extent that Skanska is entitled to damages from Semac, Semac is entitled to a setoff for the amount of loss or damage sustained as a result of Skanska's actions, as alleged in Semac's [second] amended complaint."

Skanska denied all of Semac's special defenses. Skanska also filed a third-party complaint against Pope and Scanlon, alleging fraudulent misrepresentation regarding Semac's billing for services and goods that it never performed or purchased. Pope and Scanlon denied the allegations of the third-party complaint and asserted seven special defenses to the claims against them. Skanska denied all of Pope and Scanlon's special defenses to its third-party complaint.

The parties tried this case to the court over a period of several days. Semac sought damages for Skanska's wrongful termination, in the amount of the unpaid portion of the contract price. Skanska sought damages from Semac for the $28,754,711.81 that Skanska had to pay for other subcontractors and suppliers to complete the electrical work that Semac failed to complete under the contract[3] and for the reimbursement of funds that Semac had overbilled Skanska and which Skanska had paid.

On August 23, 2017, the court issued a memorandum of decision wherein it concluded that both Semac and Skanska breached the contract. The court rejected Semac's claim of cardinal change and concluded that Semac breached the contract when it refused to continue to perform its contractual obligations. The court further found, however, that Skanska breached the contract by terminating Semac without affording it forty-eight hours to cure its breach in accordance with the contract. The court concluded that, because Skanska failed to afford Semac the contractual forty-eight hours to cure its breach, it was required to pay Semac for the work it had performed, and it was not entitled to recover damages to complete the project. The court determined that Semac had completed 65 percent of the work that it had contracted to complete, and multiplied the revised contract price of $19,114,535, which was determined by multiple change orders agreed to and executed by the parties, by that percentage to determine the amount to which Semac was entitled for the work it had performed, $12,424,447. Because, however, Semac had already billed Skanska $14,785,764.36 for the work it had performed, and Skanska had paid that amount, the court concluded that Skanska was entitled to be reimbursed $2,361,317.36. The court further found that Skanska paid Semac for materials and labor allegedly provided by two separate additional subcontractors, but were never actually paid for by Semac. The court concluded that Skanska was entitled to reimbursement for those amounts—$769,790.93 and $252,273.51,

respectively. Finally, the court determined that Semac had improperly marked up its labor cost and ordered that it reimburse Skanska in the amount of $473,748.97 for this misrepresentation. The court thus awarded Skanska a total of $3,857,130.77. The court found that Skanska failed to prove that Pope and Scanlon engaged in fraudulent conduct, and rejected the parties' remaining claims.

Semac thereafter filed a motion for reconsideration and correction of the court's award of damages on the grounds that the court allegedly omitted an undisputed credit due to Semac for certain work it had performed on the project and that certain portions of the court's damages award that compensated Skanska for overpayments resulted in double recovery. The court granted reargument, but rejected Semac's arguments and affirmed its earlier decision.

By way of an additional memorandum of decision dated November 6, 2017, the trial court granted, over Semac's objection, Skanska's motion for prejudgment interest, increasing the total amount of damages to $4,262,390.56. This appeal, filed by Skanska, and, cross appeal, filed by Semac, followed.

The following general principles are pertinent to the parties' claims on appeal. "It is axiomatic that [t]he scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. [If], however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. . . .

"In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . It is within the province of the trial court, as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence. . . .

"[I]n private disputes, a court must enforce the contract as drafted by the parties and may not relieve a contracting party from anticipated or actual difficulties undertaken pursuant to the contract, unless the contract is voidable on grounds such as mistake, fraud or unconscionability. . . . [C]ourts do not unmake bargains unwisely made. . . . Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, it is not within its power to make a new and different agreement; contracts voluntarily and fairly made should be held valid and enforced in the courts. . . . In construing an unambiguous contract, the controlling factor is the intent expressed in the contract, not the intent which the

parties may have had or which the court believes they ought to have had. . . . [If] . . . there is clear and definitive contract language, the scope and meaning of that language is not a question of fact but a question of law. . . .

"The required elements necessary to sustain an action for breach of contract are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages. . . . The existence of a contract is a question of fact to be determined by the trier on the basis of all of the evidence." (Citations omitted; internal quotation marks omitted.) *Coppola Construction Co.* v. *Hoffman Enterprises Ltd. Partnership*, 157 Conn. App. 139, 158–60, 117 A.3d 876, cert. denied, 318 Conn. 902, 122 A.3d 631 (2015), and cert. denied, 318 Conn. 902, 123 A.3d 882 (2015).

"We often have stated that whether a contract has been breached is a question of fact . . . and that this court lacks the authority to make findings of facts or draw conclusions from primary facts found. . . . Factual conclusions may be drawn on appeal, however, if the subordinate facts found [by the trial court] make such a conclusion inevitable as a matter of law . . . or [if] the undisputed facts [as they appear] in the record make the factual conclusion so obvious as to be inherent in the trial court's decision." (Citations omitted; internal quotation marks omitted.) Id., 171–72. With these principles in mind, we turn to the parties' claims on appeal.

I

We begin with Semac's assertion that the trial court erred in rejecting its claim of cardinal change. Although this claim is raised by way of Semac's cross appeal, and is thus not chronologically first in the procedural posture of this appeal, it is the first of a chain of events that gave rise to this litigation. We agree with the trial court that there was not a cardinal change in the terms of the contract and, therefore, that Semac breached the contract by abandoning the project.

In addressing Semac's claim of cardinal change, the trial court set forth the following relevant facts. The court first addressed the issue of "whether radical changes were made to the character and timing of the work." The court found: "The job was building a twelve floor hospital loaded with specialty wiring needs and equipment. Three unanticipated events threw off the detailed schedule adopted at the beginning of the job. First, the steel frame of the building took longer than expected. Second, the building's glass siding—its curtain wall—took far longer than expected, leaving large parts of the building open to the weather. Third, Skanska had to scrap its planned approach to coordinating trades—the BIM (building information management) coordination—and start over, imposing that duty on the

trades themselves." (Internal quotation marks omitted.) The court determined that "[t]he cumulative effect of these delays meant that by the summer of 2015, Skanska had lost months to these delays and was fighting to recover its schedule."

Through its project manager, Mark Miller, Skanska aggressively sought to make up for the time lost as a result of the aforementioned delays to complete the project by April, 2016, so that the hospital could open in September, 2016. The court noted: "Miller pushed his subcontractors pretty hard. From Semac he demanded—and paid for—overtime work and pressed the company to reach quickly, and then exceed, the peak of its promised manpower—without any additional money. Miller's plans also required Semac to increase its flexibility in working around other trades and working between various sections of the building. Doubtless all this put a strain on Semac. It was a big job; it was behind schedule, and everyone was required to hustle to make the whole thing work."

The court considered the expert testimony offered by the parties and found that Skanska's witnesses were more convincing in their testimony that "in large projects, changes and strains are routine" over the testimony of Semac's expert, who "dismissed even the court's suggestion that some delays on big projects are routine." The court reasoned: "This was no routine project. . . . And as for time delays—assuming they matter—as much as Skanska can't pretend the job was routine, Semac can't ignore that the job was completed close to on time, in addition to never changing its basic character. There was no year of delay; no surprise second tower to erect. Indeed, Skanska credibly claims that—for matters under its control—it would have met the preopening substantial completion date described in the schedule but for Semac bailing out at a critical moment. It also rightly emphasizes that, out of sixty-seven subcontractors, nobody bailed out but Semac."

The court found that Semac had made a profit every month of the job, right up until October, 2015, when it issued the Notice of Cardinal Change. The court found: "In fact, Skanska demanded—and got sworn declarations with every change order saying that Semac had been fully paid for any 'delays, acceleration, or loss of efficiency encountered by [Semac] in the performance of the [w]ork through the date of this [c]hange order . . . .' "

The court noted the "many irregularities" in Semac's billing to Skanska, and found that "[s]ome of Semac's bid calculations are indecipherable and even misleading to a degree. Its internal paper seems to equivocate about profit. It shows a profit in one place and then takes it away in another. Semac got paid by Skanska for some goods and services without telling Skanska that it was pocketing the money and not paying for the labor and

materials because of a claimed dispute. It hid payments to its owner in its billing records by sending them to a shell company for nonexistent materials for the job. It changed managers on the job three times, suffered significant employee turnover rates, and employed far more than an ordinary number of cheaper and less productive apprentices on the job. It told Skanska that it was billing Skanska its actual costs for labor on contract change jobs when it was instead pocketing a profit on every hour worked. It swore in payment documents that it had been paid for delays on the job and then pulled the rug out from under Skanska by claiming the opposite. It never adequately tied its alleged losses from delays to particular parts of the job. And the written records of communications before the [issuance to Skanska of the Notice of Cardinal Change] do not nearly reflect the kind of urgency that would suggest that things happening on the site were at a critical juncture requiring Skanska's urgent financial intervention. Instead, one day in October, 2015, there was a blunt letter from Semac to Skanska demanding money and—within several days—there was this lawsuit."

The court concluded: "This case doesn't meet contemporary views in commercial cases of what is a radical or cardinal change. . . . In October, 2015, [Semac] wrote to Skanska saying that it would leave if it did [not] get the extra money that it asked for. When Skanska refused to pay or even parley, Semac affirmed in telephone calls that it would pick up its tools and go home. The day after Semac affirmed this, Skanska found that Semac had dismissed its own subcontracted labor for the day and was busying its own men with removing their equipment and tools from the site. Semac insists that some men were somewhere still working on the actual job, but the evidence supporting this claim is vague and the evidence against it is better. Skanska officials searched the site and found nobody from Semac working anywhere. Semac never said who was doing what, [or] where, that supposedly meant they were still on the job. It has not proved it was carrying on with the work while merely trying to negotiate.

"Semac temporarily or permanently abandoned working, and under Section 12.1 of the contract abandoning the work—even temporarily—is a material breach of the contract. Thus, Semac materially breached its contract with Skanska."

On appeal, Semac claims[4] that "[s]ignificant delays in the coordination work, the steel construction and installation of the curtain wall—all Skanska's responsibilities—contributed to the cardinal change." We are unpersuaded.

Although our case law has not addressed an issue of cardinal change per se, it has addressed an analogous situation in which the final plans for a certain project differed so substantially from the original plans for

which the parties had contracted that the initial contract was rendered a nullity. *Randolph Construction Co.* v. *Kings East Corp.*, 165 Conn. 269, 334 A.2d 464 (1973). In *Randolph Construction Co.*, our Supreme Court held: "In dealing with contract provisions allowing alterations or modifications, an appropriate standard for substantiality is whether such changes unreasonably alter the character of the work or unduly increase its cost, or effect such a material change as to constitute a radical departure from the original contract." Id., 274. "The issue of substantiality, a determination of whether the enumerated differences in the final plans were substantial, is a question of fact which depends on a consideration of the circumstances. . . . The factual issue includes . . . the total undertaking covered by the writing, the amount of work affected by the alterations and the net change in the cost of performance." (Citations omitted.) Id.

Consistent with the court's ruling in *Randolph Construction Co.*, other jurisdictions have explained that "[a] cardinal change is a drastic modification beyond the scope of the contract that altered the nature of the thing to be constructed." (Internal quotation marks omitted.) *Pellerin Construction, Inc.* v. *Witco Corp.*, 169 F. Supp. 2d 568, 587 (E.D.La. 2001). "By definition, a cardinal change is so profound that it is not redressable under the contract." (Internal quotation marks omitted.) Id. A cardinal change thus constitutes a breach of contract. Id.

The standard courts look to in deciding whether a cardinal change is present is "whether the modified job was essentially the same work as the parties bargained for when the contract was awarded." (Internal quotation marks omitted.) *Air-A-Plane Corp.* v. *United States*, 408 F.2d 1030, 1033 (Ct. Cl. 1969). "[T]here is a cardinal change if the ordered deviations altered the nature of the thing to be constructed." (Internal quotation marks omitted.) Id. "[T]he problem is a matter of degree varying from one contract to another and can be resolved only by considering the totality of the change and this requires recourse to its magnitude as well as its quality." (Internal quotation marks omitted.) Id. "There is no exact formula . . . . Each case must be analyzed on its own facts and in light of its own circumstances, giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole." (Internal quotation marks omitted.) Id.

Here, Skanska and Semac entered into a 241 page contract, pursuant to which Semac agreed to perform all of the electrical work for the project. Section 2.4 of exhibit E to the contract addressed the duty of Semac to coordinate its work with Skanska, the hospital and other subcontractors, and provided that Semac "shall not be entitled to an adjustment of the [s]ubcontract

[a]mount or an extension of time for its field coordination activities as [Semac] shall anticipate and provide for such activities in the [s]ubcontract [a]mount and agreed time for performance." Section 3.1 provided that Semac represented that it had "taken into consideration and made allowances for all hindrances and delays incident to its [w]ork as provided in Sections 2.2 and 2.4" Section 3.2 provided that Semac would perform its work in accordance with the schedule set by Skanska "as it may be revised and amended from time to time by [Skanska], including in Section 9.2." Section 9.2 provided that Skanska "shall be entitled to decide the time, order and priority for performance of the various portions of [Semac's] [w]ork" and that Semac would "not be entitled to an adjustment of the [s]ubcontract [a]mount or an extension of time in connection with any such direction by [Skanska] as [Semac] shall anticipate and provide for such activities in the [s]ubcontract [a]mount and agreed time for performance." Section 9.3 provided that Skanska could require Semac to "increase its labor force, number of shifts and/or overtime operations, days of work, or to provide additional equipment or materials."

Additionally, article 10 of exhibit E specifically addressed, "Changes and Impacts." Section 10.1 provided that Skanska had the right, in its discretion, to direct a change upon written notice to Semac. The contract set forth a detailed procedure for the implementation of change orders. Section 10.3 provided Skanska with the sole discretion to determine whether different pricing was required as a result of a change order, and, if so, Skanska had the sole discretion to determine the amount of additional compensation. Sections 10.3 through 10.9 specifically set forth the procedure that Semac was required to follow to claim additional compensation for the change orders, and provided that a failure to follow those procedures would result in a waiver of any such claim. Section 11.3 provided that, in agreeing to the contract amount, Semac had assessed its ability to recover additional compensation in connection with a work delay or interference.

Despite the comprehensive and unequivocal contract language cited in the preceding paragraphs, Semac claimed that there had been a cardinal change "to the planned method and sequence of construction for the electrical work" that it had contracted to perform. Semac claimed that there had been a cardinal change "due to the drastic and unforeseen modifications and changes that have been made to Semac's sequence of construction and the schedule parameters set forth in the subcontract, which has unreasonably altered the character of the work and unduly increased its cost." Specifically, Semac stated that due to the failure to provide a weathertight building on schedule, the sequence of its work was different than originally contemplated, and Semac was required to work faster and

under conditions that were not covered in the contract, thus resulting in increased costs that were not anticipated by Semac.

Semac's claim fails because, as aptly found by the trial court, Semac was required to anticipate issues of this nature when it submitted its bid for and signed the contract. The explicit language of the contract demonstrated clearly that the parties contemplated the possibility, and even the likelihood, of delays and changes in the originally planned schedule, and required Semac to anticipate those possibilities. Although the project experienced multiple delays, some of which were significant and some that resulted in the resequencing of Semac's work and a change of the time of the year during which its workers were required to work, Semac was still performing the same work that it had contracted to perform. Although Skanska and Semac executed thirty-eight change orders, there was no evidence presented that the change orders altered the character or nature of the work that Semac had originally contracted to perform. In executing each change order, Semac attested that it had been fully compensated "for all costs, claims, markups, and expenses, direct or indirect, attributable to this or any other prior [c]hange [o]rders" and "for any delays, acceleration, or loss of efficiency encountered by [Semac] in the performance of the [w]ork through the date of this [c]hange [o]rder, and the performance of this and any prior [c]hange [o]rders by or before the date of [s]ubstantial [c]ompletion." It is clear that the changes in the project were not so profound that they were not redressable under the contract, as they were, in fact, redressed via the change orders executed by the parties. The final change order, to which Semac agreed and for which it was compensated, was dated October 12, 2015, less than two weeks prior to Semac's issuance to Skanska of the Notice of Cardinal Change.

Moreover, despite representing to Skanska that it was billing for actual costs of labor, Semac was actually inflating its bills to make a profit "on every hour worked."[5] This fact alone belies Semac's claim that the changes to the project so materially affected its costs that it had no choice but to abandon it and supports the trial court's determination that the situation leading up to the claim of cardinal change could not have been so urgent as to justify Semac's demand for further funds.

Although the trial court employed colorful hyperbole to demonstrate that the character of the final product, the hospital, had not changed, Semac is correct in its assertion that the end result does not dictate the existence of a cardinal change. That was not, however, the focal point of the trial court's reasoning. The trial court focused, and properly so, on the nature and impact of the delays on the work expected of and performed by Semac. Those delays were not extraordinary in a project

of this magnitude and complexity. Neither the character nor the nature of the work expected of or performed by Semac was ever altered in any way, never mind in a way that could be construed as substantial or radical. Moreover, the delays were contemplated in the contract between Semac and Skanska, and Semac was compensated for them right up until it issued its Notice of Cardinal Change to Skanska. On the basis of the foregoing, we agree with the trial court's determination that Semac failed to prove that there was a cardinal change in the terms of its contract with Skanska and with its conclusion that Semac materially breached the contract.

## II

We next address Skanska's challenge to the trial court's conclusion that it also materially breached its contract with Semac by failing to provide Semac with a full forty-eight hour cure period before terminating its contract. Skanska does not dispute that it waited only twenty-four hours from the time that it rejected Semac's Notice of Cardinal Change to terminate Semac. Skanska argues, however, that, for various reasons, Semac was not entitled to a forty-eight hour cure period. We disagree.

"Although it is generally accepted that contracting parties may reserve the right to terminate a contract for convenience or cause upon a specified period of notice . . .  [i]f a party who has a power of termination by notice fails to give the notice in the form and at the time required by the agreement, it is ineffective as a termination. . . . One who deviates from the terms and the circumstances specified in the agreement for giving notice . . . may be regarded as having repudiated the contract, with all the effects of repudiation including giving the injured party a right to damages . . . ." (Citations omitted; internal quotation marks omitted.) *Coppola Construction Co.* v. *Hoffman Enterprises Ltd. Partnership*, supra, 157 Conn. App. 169. "[A] party's failure to comply with the notice provision in a termination clause . . . amounts to a material breach of the contract." Id., 172.

Here, the trial court concluded that Skanska "violated the contract terms when it responded to Semac's moves by declaring that it was terminating Semac for cause" without affording Semac forty-eight hours to cure its default under the contract. The court noted that Skanska's rush to terminate Semac was likely "motivated by the contract clause that allowed Skanska to seize Semac's equipment following a for-cause termination." The court reasoned: "Under the contract, Skanska had the right to terminate Semac anytime it wanted with cause or without. But for Skanska to terminate Semac for cause as it said it was and grab Semac's equipment, the contract provides that it had to give Semac forty-eight hours to cure its breach and get back on the job.

The contract doesn't name any exception or qualify this rule in any way. It doesn't say that the provision doesn't apply when the other party breaches first. It doesn't say it doesn't apply when the other party isn't likely to make use of the forty-eight hour period to cure. Elsewhere in the contract it does say that Skanska may seek any other remedies available at law outside the contract, but it doesn't say anything about rewriting explicit provisions already contained in the contract to make them easier on Skanska. So the forty-eight hour notice that was not given had to be given for Skanska to terminate Semac for cause.

"In pressing a strict application of the contract, Skanska must suffer the consequences of its own handiwork. We will never know what might have happened during that forty-eight hour period. Semac was facing ruin by continuing on the same terms, so absent some change it almost certainly would have left. But maybe Miller's call for negotiations would have prevailed after everyone cooled down, and some sort of compromise might have been reached. It would have been tough, but the notice period might have achieved something. What is clear is that by giving no warning of its intention to terminate Semac, Skanska didn't give the required forty-eight hours' notice required by its contract."

On the basis of the foregoing, and relying on this court's decision in *Coppola Construction Co.* v. *Hoffman Enterprises Ltd. Partnership*, supra, 157 Conn. App. 169, in which we held that failing to give a required termination notice at the required time is a material contract breach, the court concluded that both Semac and Skanska materially breached the contract.

In challenging the trial court's determination that it breached its contract with Semac, Skanska does not dispute that it did not afford Semac forty-eight hours to cure its default. Skanska argues, however, that, for several reasons, Semac was not entitled to that cure period. Skanska first claims that the court erred in assuming that it terminated Semac pursuant to § 12.1 of the contract, the provision that required it to give Semac forty-eight hours to cure its breach. Because Skanska actually pleaded in its counterclaim that it had "declared Semac in default . . . pursuant to exhibit E, article 12 of the subcontract," the court properly held the parties to their obligations under that section of the contract. Moreover, Skanska's reliance on § 12.1 can be inferred from its communications to Semac following its receipt of the Notice of Cardinal Change wherein it threatened to exercise its rights under the contract if Semac did not rescind its repudiation of the contract, specifically its right to seize all of Semac's tools and equipment, a right afforded under § 12.1.

Skanska also argues that Semac's material breach and repudiation of the contract and its abandonment of the project absolved Skanska of its obligation to

afford Semac a forty-eight hour cure period. In support of this claim, Skanska argues for the application of multiple common-law principles that are often applicable to contract disputes, namely, the principles of first breach, repudiation, anticipatory breach, and waiver. Skanska's argument for the application of these principles overlooks the clear language of § 12.1 of the contract that outlined the procedure to be followed if Semac abandoned the project or otherwise defaulted on its contractual obligations. Section 12.1 explicitly and comprehensively sets forth the parties' rights and responsibilities in the event Semac was terminated for its abandonment of the project, the very basis for Skanska's termination. We agree with the trial court's determination that Skanska should be held to the words of the contract, just as Semac had been, and was thus not excused from affording Semac a forty-eight hour cure period. To hold otherwise would excuse Skanska's noncompliance with a contractual requirement, and "would create a new and different agreement, which courts cannot do." *Coppola Construction Co.* v. *Hoffman Enterprises Ltd. Partnership*, supra, 157 Conn. App. 171, citing *Collins* v. *Sears, Roebuck & Co.*, 164 Conn. 369, 374, 321 A.2d 444 (1973) (in construing contract, court cannot disregard words used by parties or revise, add to, or create new agreement).

Skanska also claims that, "[i]n light of Semac's conduct, verbal, and written statements from October 19, 2015 through October 22, 2015, it is uncontroverted that Semac would not perform under the subcontract and that waiting an additional [twenty-four] hours for a reconciliation that was not coming would have been futile." Skanska argues that Semac told it "in at least six different ways that it would be leaving" the project, and thus affording Semac an additional twenty-four hours to cure its breach would have been futile. As noted, the contract expressly provided that Semac was afforded a forty-eight hour cure period, and did not provide for any exceptions or qualifications to that requirement. Additionally, we agree with the trial court that it cannot be known for certain, despite Semac's repeated and unwavering representations that it would not continue to work on the project unless Skanska met its monetary demands, what the parties may have worked out. The trial court found that "[w]e will never know what might have happened during that forty-eight hour period." We decline to speculate that waiting the additional hours required under the contract would have been futile.

Skanska finally contends that the trial court's enforcement of § 12.1 of the contract, and its rejection of Skanska's assertion of various common-law doctrines to defend its failure to abide by the express contract language of § 12.1 requiring the forty-eight hour cure period rendered meaningless § 19.5 of the contract, which provided that the remedies outlined in the contract were not the exclusive remedies available to Skan-

ska. Although § 19.5 provides that the remedies set forth under the contract are not the exclusive remedies of the parties, we do not agree with Skanska's contention that it can turn to the common law to avoid an obligation contained expressly in the contract.

In sum, we agree with the trial court's conclusion that, just as Semac was bound by the express language of the contract that contemplated the potential of delays and changes of sequencing, Skanska is bound by the language of the contract that expressly set forth the procedure that Skanska was required to follow if Skanska wanted to terminate Semac for abandonment of the project. Skanska cannot use the common law to excuse it from abiding by the language of the contract that it drafted. As the trial court noted, the contract very heavily favored Skanska, and Skanska failed to afford Semac one of the few protections afforded to Semac under the contract. In so doing, the trial court properly found that Skanska breached the contract.[6]

## III

Both parties also challenge the court's award of damages to Skanska in the amount of $3,857,130.77.[7] "It is axiomatic that the sum of damages awarded as compensation in a breach of contract action should place the injured party in the same position as he would have been in had the contract been performed. . . . The injured party, however, is entitled to retain nothing in excess of that sum which compensates him for the loss of his bargain. . . . Guarding against excessive compensation, the law of contract damages limits the injured party to damages based on his actual loss caused by the breach. . . . The concept of actual loss accounts for the possibility that the breach itself may result in a saving of some cost that the injured party would have incurred if he had had to perform. . . . In such circumstances, the amount of the cost saved will be credited in favor of the wrongdoer . . . that is, subtracted from the loss . . . caused by the breach in calculating [the injured party's] damages. . . . The plaintiff has the burden of proving the extent of the damages suffered." (Citation omitted; internal quotation marks omitted.) *Coppola Construction Co.* v. *Hoffman Enterprises Ltd. Partnership*, supra, 157 Conn. App. 162.

"[W]e review [a] trial court's damages award under the clearly erroneous standard, under which we overturn a finding of fact when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) Id., 176.

With the previously cited principles in mind, we begin by reviewing the factual and legal bases underlying the trial court's award of damages. The court noted that

"Semac said it was due around $3.6 million for work completed to date when it left the job and wants an order for this money among other things. Skanska's counterclaim seeks some $26 million, almost all of it for the cost of completing the work using replacement subcontractors. Because they both assume a breach of contract only by their adversary, both parties' claims for damages are wrong."

The court reasoned: "[B]oth parties here breached. Semac can't fairly claim expectation damages as its reward for temporarily or permanently abandoning the contract. . . . Skanska, by contrast, had the right to terminate Semac for convenience without any grace period at all. . . . Indeed, the Skanska contract says that an erroneous termination for cause converts automatically to a termination for convenience. That contract also says termination for convenience means Skanska must pay—not expectation damages—but the money due for the work performed to date. That money is the right measure here, but as we will see, it doesn't matter. The damages would be the same as expectation damages.

"In calculating what was due [to] Semac for work up to the date of its departure, Semac points out that it had several bills to Skanska outstanding when it left the job. It claims [that] Skanska's breach means it had the right to stop work and, more important, Skanska had commanded it to cease performing. The latter fact certainly means Semac didn't have to complete the job under the contract terms. After all, Skanska can't have it both ways. Given that the contract terms mean that Skanska terminated Semac for its own convenience, Skanska can't contradictorily claim that Semac should have kept working or pay for the cost of replacement subcontractors. It might have been different with a proper termination for cause based on Semac temporarily or permanently abandoning the job, but that's not what the contract says happened here.

"So Semac didn't need to complete the job, isn't liable for the costs of replacement subcontractors, and is due the money that was owed to it at the time it left." In so finding, the court determined that Semac was entitled to a termination payment under § 12.4 of its contract with Skanska. The court nevertheless concluded that Semac "wasn't due any money at the time it left and actually had money the contract required it to return to Skanska."

To determine the amount of the termination payment to which Semac was entitled, the trial court found that it could not simply rely upon the amounts billed by Semac due to its billing "irregularities and its incentive to inflate its bills . . . ." The court thus determined that the best way to determine the amount to which Semac was entitled was to ascertain the percentage of the entire contract that Semac had fulfilled and multiply

that percentage by the total amount of the contract. Both parties presented testimony as to their respective views as to the percentage of the job that had been completed when Semac was terminated, but the court found that the most persuasive testimony in this regard was offered by Miller, Skanska's project manager, who opined that Semac had completed 65 percent of the job. The court adopted Miller's position and calculated that Semac was entitled to $12,424,447, which was 65 percent of the revised contract price of $19,114,535. Because Semac had already billed and been paid $14,785,764.36 from Skanska, Semac had received $2,361,317.36 more than it should have for the work that it had completed. To that amount, the trial court added funds that Semac had collected from Skanska for overpayments to two of Semac's subcontractors and overpayment for labor rates on which Semac improperly had added a profit, for a total additional amount of $1,495,813.41. The court thus concluded that Semac owed Skanska a total of $3,857,130.77.[8]

On appeal, Skanska argues that, "[d]ue to Semac's material breach, Skanska was excused from further performance of its obligations under the contract, and was entitled to expectation damages." Skanska claims, "as a result of the trial court's incorrect determination that Skanska also breached the subcontract, it improperly failed to award its expectation damages." Because we disagree with Skanska's argument that it did not breach the contract, as discussed herein, we also reject its claim that it was entitled to expectation damages.

Skanska also claims that it is entitled to expectation damages under the common law because § 19.5 provided that its contractual remedies were not its exclusive remedies. We disagree. As stated previously, § 12.1 of the contract explicitly provided for the procedure to be followed by Skanska in the event of a breach by Semac. Skanska failed to abide by the express requirement that it afford Semac a forty-eight hour cure period and, thus, also breached the contract, and its termination for cause of Semac was transformed into a termination for convenience. Skanska cannot now claim entitlement to a common-law remedy after it forfeited its right to a contractual remedy as a result of its own breach.

Semac argues that the court erred in not awarding it a termination payment under § 12.4 of the contract, which was triggered when Skanska failed to afford Semac a forty-eight hour cure period, transforming the termination for cause into a termination for convenience. Semac's challenge in this regard is misplaced in that the trial court expressly did conclude that Semac was entitled to the termination payment when it concluded that Semac "didn't need to complete the job, isn't liable for the costs of replacement subcontractors, and is due the money that was owed to it at the time it left." The court further found, however, that Semac's

billing practices were too irregular to confidently award damages based upon Semac's invoices, as contemplated by § 12.4 of the contract, which provided that the termination payment "shall be comprised of: (i) amounts invoiced and due for [w]ork performed but not yet paid; (ii) payment for [w]ork satisfactorily completed but not yet invoiced by [Semac] prior to the termination; (iii) retainage held by [Skanska] at the date of termination; and (iv) all reasonable, actual termination costs incurred by [Semac] in terminating the [w]ork . . . ."

The court therefore employed an alternative method of calculating the termination payment by determining the percentage of the project that Semac had completed and multiplying that percentage by the total contract price. Although potentially somewhat imprecise, it cannot reasonably be argued that this method of calculating the termination payment ran afoul of § 12.4 of the contract, or that it was unfair to Semac. Indeed, it is consistent with Semac's claim that it be paid for the work that it completed and its theory of quantum meruit.[9] If Semac had not front-loaded its invoices, ensuring that it made a profit for every month that it billed Skanska, it would not have been in the position of having its termination payment credited by monies that it should not have prematurely collected from Skanska. In light of the foregoing, we conclude that the trial court's award of damages was not erroneous.

IV

Finally, Skanska claims that the trial court erred in failing to find that Pope and Scanlon committed fraud when they swore under oath to the accuracy of invoices submitted to Skanska for a total of $1,022,064.44 for goods and services that it represented it had paid, but actually never did pay, to other subcontractors, Gexpro and TPC Associates, Inc. We are not persuaded.

"[I]t is well settled that the essential elements of fraud are: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury. . . . All of these ingredients must be found to exist. . . . Additionally, [t]he party asserting such a cause of action must prove the existence of the first three of [the] elements by a standard higher than the usual fair preponderance of the evidence, which . . . we have described as clear and satisfactory or clear, precise and unequivocal. . . . Finally, [t]he party claiming fraud . . . has the burden of proof. . . . Whether that burden has been met is a question of fact that will not be overturned unless it is clearly erroneous." (Internal quotation marks omitted.) *Trumbull* v. *Palmer*, 123 Conn. App. 244, 257, 1 A.3d 1121, cert. denied, 299 Conn. 907, 10 A.3d 526 (2010).

"A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . [A]s a reviewing court [w]e must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude. . . . The weight to be given to the evidence and to the credibility of witnesses is solely within the determination of the trier of fact. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *McLeod* v. *A Better Way Wholesale Autos, Inc.*, 177 Conn. App. 423, 450, 172 A.3d 802 (2017).

Here, in rejecting Skanska's claim that Pope and Scanlon engaged in fraudulent conduct, the trial court reasoned: "The court had ample time to judge what Scanlon and Pope said and how they said it. The court can't find they clearly and convincingly committed fraud when they overcharged Skanska. Pope's approach to being [chief financial officer], as he explained it, made some sense. His job was to sign for Semac after other people at the company were presumed to have vetted what he was to sign. He didn't do their jobs for them; he signed on behalf of his company in reliance on what his company told him. Skanska may find it unconvincing, but Pope's rationale about the Gexpro advanced billing of material isn't clearly and convincingly fraudulent either. It was supported by documents directly noting that material being charged for had not yet been received. At a minimum, he seemed to have sincerely and not heedlessly believed the advance billing was a reasonable practice and that is enough to avoid culpability given the applicable standard.

"Like Pope, Scanlon never bothered to read the entire contract or the waivers being signed. But as we have seen, it almost didn't matter what they said anyway. Semac had to agree or lose the contract to the next bidder or, after signing the main contract, get no pay for the work it did. Given the relative positions of the parties, Semac had no choice, and the court does not believe Skanska's suggestions that it should assume it would have agreed to material changes to the bargain if asked. As commercial and consumer contracts become increasingly intricate and the bargains increasingly unbalanced, it is a sad truth that hardly anyone reads them anymore while the courts and the lawyers keep on reading them and the courts almost always enforce them. This predictable form of neglect can't form the basis for fraud since in this context Scanlon's neglect

was more pragmatic than reckless. This and some of his arguably inconsistent and inadequate efforts may have put his company on the hook for breach of contract, but they don't support a finding that Scanlon committed fraud.

"Fraud is something beyond Semac stretching things concerning the materials and the money it withheld for instance from subcontractor TPC. About TPC, Semac interpreted things in the light most favorable to itself, including its view that because the payments weren't due to TPC, in its view it is protected by the language in the waivers about having paid all money 'due' to subcontractors. But this doesn't amount to a lie or reckless misstatement or, at least in light of the court's credibility judgments there isn't clear and convincing evidence of intent or recklessness: merely strained and self-interested interpretations. None of them amount to good reasons to impose massive financial liabilities on Scanlon or Pope."

On appeal, Skanska argues that the record clearly showed that Pope and Scanlon acted fraudulently by not reading or verifying the accuracy of the content of the invoices to which they swore under oath. To be sure, that conduct, even as described by the trial court, strains the bounds of fraud, and reveals, at best, gross incompetence displayed by Pope and Scanlon. The trial court nevertheless found that, based upon its observation of the demeanor and attitude of Pope and Scanlon, neither of them acted with fraudulent intent. Because we cannot second-guess the trial court's credibility assessments, its rejection of Skanska's fraud claim must stand.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The court also awarded prejudgment interest in the amount of $405,259.79, for a total due to Skanska of $4,262,390.56. Neither party has challenged the court's award of prejudgment interest.

[2] Skanska also alleged defamation and tortious interference, but those claims were dismissed for lack of subject matter jurisdiction.

[3] Prior to trial, the parties stipulated to the fact that Skanska spent $28,754,711.81 for other subcontractors and suppliers to complete Semac's subcontract scope of work.

[4] In its brief to this court, Semac claims: "The gravamen of this lawsuit . . . centers on whether the original $19.1 million construction contract, which the trial court found to be 65 percent complete when Skanska wrongfully terminated Semac, but which cost an *additional* $28.7 million to finish after Semac left, is a fundamentally different contract than the one Semac agreed to perform. In the original contract Semac bargained for about 119,000 hours of work, but by the time the contract was complete, the nature of the work and conditions of performance had changed so dramatically that the total labor hours required for completion of the electrical work exceeded 430,000." (Emphasis in original.) Semac argues that the trial court erred in rejecting its claim of cardinal change because it had "agreed to perform electrical work for Skanska for $19.1 million, [but c]hanges to Semac's working conditions . . . increased the total cost of the electrical work to $45.6 million, [and] thus constituted a cardinal change as a matter of law." Semac contends: "The $45.6 million contract Skanska demanded was simply not the $19.1 million electrical contract for which Semac bargained."

As explained herein, and conceded by counsel, this argument is not factually accurate. The cardinal change upon which Semac relied on October 22,

2015, did not, and, obviously, could not have contemplated the amount of money and hours that Skanska would be required to expend to complete the electrical work on the project several months after Semac refused to continue to its work on the project. Indeed, much of the additional cost is attributable to the fact that the substitute electrical contractors presented exorbitant bills that Skanska had to pay in order to finish the project on time.

[5] Although not necessarily relevant to our review of the trial court's rejection of Semac's claim of cardinal change, we note the likely validity of the court's speculation of Semac's true reason for abandoning the project: because it had front-loaded its billing, it realized that it was running out of funds in the fixed price contract against which it could bill Skanska.

[6] Semac asserts that Skanska's failure to allow it the full forty-eight hours to cure had the legal effect of maintaining Semac's conduct in the status of a default and not a breach. We do not agree. While Skanska's failure to afford the required cure period breached the contract, it in no way exonerated Semac for its own material breach.

[7] This amount does not include the court's award of prejudgment interest.

[8] Semac subsequently moved for reconsideration of the amount of damages based on an alleged miscalculation of certain of the credits applied to the termination payment. The court granted reargument, but affirmed its decision. This is not relevant to the claims on appeal.

[9] Semac claims in its brief to this court that it was entitled to a termination payment under § 12.4 of the contract in the amount of $2,108,290.87. As Semac explains, this is the same amount that it would be entitled to under a theory of quantum meruit for the value of the work that it had completed. This is the very basis upon which the court calculated its award of damages.

---