******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# PROFESSIONAL ELECTRICAL CONTRACTORS OF CONNECTICUT, INC. *v.* THE STAMFORD HOSPITAL ET AL.
## (AC 41931)

Bright, Moll and Bear, Js.

*Syllabus*

The plaintiff, a second tier subcontractor, sought to recover damages from the defendants H Co., a hospital, S Co., a general contractor, and E Co., a subcontractor, for, inter alia, quantum meruit or unjust enrichment, and to collect on a bond issued by the defendant F Co. posted pursuant to statute (§ 49-37), in connection with a dispute arising from a project relating to the expansion and renovation of H Co. Following the trial court's granting of motions for summary judgment filed by F Co. and S Co., the plaintiff appealed to this court. *Held*:

1. The trial court erred in granting S Co.'s motion for summary judgment on the count of the complaint in which the plaintiff alleged that H Co., S Co. and E Co. were liable in quantum meruit or unjust enrichment; the plaintiff alleged that it performed services at the request of H Co., S Co. and E Co., and that H Co., S Co. and E Co. accepted and benefited from the plaintiff's work, and S Co. presented no evidence establishing that it paid E Co. or someone else for the plaintiff's specific services, and, thus, there existed a genuine issue of material fact with respect to the plaintiff's claim for quantum meruit or unjust enrichment.

2. The trial court erred in granting the motion for summary judgment filed by S Co. and F Co. on the count of the complaint in which the plaintiff sought to collect on the surety bond issued by F Co.: under Connecticut's mechanic's lien statutes (§§ 49-33 and 49-36), recovery was not barred to the second tier subcontractor plaintiff solely because the first tier subcontractor had been paid in full by S Co.; moreover, S Co. and F Co. could not prevail on their alternative ground for affirmance that the lienable fund had been exhausted by the costs of the project and that the plaintiff did not have a contract with H Co., S Co. or F Co.; there was a lienable fund still available in the amount still owed by H Co. to S Co. at the time the plaintiff gave statutory notice (§§ 49-34 and 49-35) of its lien to H Co., regardless of whether H Co. continued to make payments to the nondefaulted S Co., a construction of the applicable statutes that was supported by the legislative history.

Argued November 18, 2019—officially released March 17, 2020

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Stamford, where the plaintiff withdrew the action as to the named defendant; thereafter, the court, *Hon. Edward R. Karazin, Jr.*, judge trial referee, granted the motions for summary judgment filed by the defendant Skanska USA Building, Inc., et al., and rendered judgment thereon, from which the plaintiff appealed to this court. *Reversed in part; further proceedings.*

*Kenneth A. Votre*, for the appellant (plaintiff).

*Michael J. Donnelly*, with whom was *Kevin W. Munn*, for the appellee (defendant Sanska USA Building, Inc.).

*Charles I. Miller* filed a brief for the appellee (defendant Fidelity and Deposit Company of Maryland).

*Opinion*

BRIGHT, J. The plaintiff, Professional Electrical Contractors of Connecticut, Inc., appeals from the summary judgment rendered by the trial court in favor of the defendants Fidelity and Deposit Company of Maryland (Fidelity)[1] and Skanska USA Building, Inc. (Skanska).[2] On appeal, the plaintiff claims that the court erred in rendering summary judgment on counts two and three of its complaint because there were genuine issues of material facts and neither defendant was entitled to judgment as a matter of law. Specifically, the plaintiff claims that (1) Skanska failed to prove that there existed no issues of material fact on the plaintiff's equitable claim of quantum meruit or unjust enrichment, and (2) neither defendant established that it was entitled to judgment as a matter of law on the plaintiff's bond claim because the claim is viable pursuant to General Statutes §§ 49-33 and 49-36. We agree with the plaintiff on both claims. Accordingly, we reverse in part and affirm in part the judgment of the trial court.[3]

The following facts, which were uncontested for summary judgment purposes, and procedural history are relevant to our consideration of the issues on appeal. The plaintiff commenced this action by service of process on January 4, 2017. In its complaint, the plaintiff alleged, in count one, that Semac Electrical Company, Inc. (Semac), Skanska, and The Stamford Hospital (hospital) were in breach of contract on the basis of the following alleged facts: the hospital had entered into a contract with Skanska to provide construction services to the hospital (project); Skanska entered into a subcontract agreement with Semac for electrical work on the project; Semac entered into a second tier subcontract agreement with the plaintiff to perform electrical work on the project; on October 3, 2015, the plaintiff began to furnish materials and services for the project; the plaintiff furnished materials and services in accordance with the terms of its contract; the plaintiff has demanded payments in the amount of $38,509.07; and Semac, Skanska, and the hospital all have refused to pay the plaintiff for its materials and services in breach of contract.

In count two of its complaint, the plaintiff alleged that Semac, Skanska, and the hospital were liable under the theories of quantum meruit or unjust enrichment. In addition to the facts alleged in count one, which the plaintiff incorporated into count two, the plaintiff also alleged that it performed services and incurred costs at the request of Semac, Skanska, and the hospital; its services were worth at least $38,509.07; Semac, Skanska, and the hospital accepted and benefited from the plaintiff's work; the plaintiff requested payment for the reasonable value of the services it rendered; Semac, Skanska, and the hospital have refused to pay the plaintiff; and Semac, Skanska, and the hospital have been

unjustly enriched.

In the third count of its complaint, the plaintiff sought to collect on the bond pursuant to General Statutes § 49-37. Specifically, it alleged in count three that Skanska submitted a bond in the amount of $38,509.07 in substitution for the mechanic's lien that had been filed against the hospital in the original amount of $42,359.97; on January 27, 2016, Fidelity issued the surety bond in the amount of $42,359.97; Skanska has failed to pay the plaintiff, despite repeated demands for the sum of $38,509.07; and Fidelity has refused to pay the plaintiff on the bond.

Fidelity filed an answer and set forth a special defense in which it alleged that the lienable fund had been exhausted by the costs of the project, and that the plaintiff did not have a contract with the hospital, Skanska, or Fidelity. Skanska also filed an answer in which it, inter alia, denied having any type of contract with the plaintiff, and it left the plaintiff to its proof on other allegations set forth in the complaint. Skanska did not file a special defense.

On March 29, 2018, Skanska filed a motion for summary judgment on the plaintiff's complaint. In its motion, Skanska argued that it was entitled to judgment as a matter of law because (1) there was no lienable fund available because all funds had been exhausted in completing the project, (2) there existed no contract between it and the plaintiff, and (3) its payment to Semac, the party with whom the plaintiff had contracted, barred the plaintiff's claims for quantum meruit or unjust enrichment. In support of its motion for summary judgment, Skanska submitted the affidavit of Michael J. Smerglio, the executive director of facilities management for the hospital. Smerglio averred that the hospital and Skanska had entered into a contract for the construction and renovation of the hospital, which required Skanska to act as the construction manager for the project. He also averred that Skanska would send the hospital periodic requests for payment on the basis of the work that had been completed, and that the hospital would produce the payments after making any necessary adjustments. Further, he averred that the hospital and Skanska had entered into a series of change orders that expanded and refined the work to be done on the project, which then adjusted the final contract price to a maximum price of $284,091,867. Smerglio acknowledged that the plaintiff served the hospital with a notice of mechanic's lien on January 13, 2016, and that, as of that date, the hospital had paid to Skanska the sum of $216,637,556.56 on the project, and that it had not paid any other entity for work done on the project. Smerglio additionally averred that, after January 13, 2016, the hospital paid Skanska an additional $67,354,375.44 for work on the project, for a total of $283,991,932, with the remaining $99,935 held as

retainage, pending completion of some punch list items. Smerglio also declared that Skanska had not been in default on its contract with the hospital. Appended to Smerglio's affidavit were several exhibits, the first of which provided that the original amount of the contract between the hospital and Skanska, before the series change orders, was $267,706,729.

Skanska also submitted the affidavit of Mark Miller, its senior vice president and the director for the project. Miller averred in relevant part that in October, 2015, Semac breached its subcontract with Skanska and abandoned the project, requiring Skanska to hire replacement subcontractors to complete the work at an increased cost, which was borne by Skanska and not by the hospital. Miller further attested that there never was a contract between Skanska and the plaintiff, the hospital and the plaintiff, or Fidelity and the plaintiff in relation to the project, and that the plaintiff was a second tier subcontractor on the project.

On April 2, 2018, Fidelity filed a motion for summary judgment, specifically joining Skanska's motion and memorandum as to count three of the plaintiff's complaint, which is the bond claim.

The plaintiff filed an opposition to the motions for summary judgment, arguing that there were genuine issues of material fact that prohibited the granting of the motions for summary judgment and that there was no merit to the motions as to the bond claim because it is uncontested that the lienable fund was not exhausted at the time the plaintiff filed its mechanic's lien. No affidavits or other evidence were attached to the plaintiff's memorandum in opposition.

On July 11, 2018, the court rendered summary judgment in favor of the defendants, concluding that there were no genuine issues of material fact and that the defendants were entitled to judgment as a matter of law. As to the plaintiff's claim for breach of contract, the court stated that the plaintiff had conceded that it did not have a contract with Skanska and, therefore, that count one of the complaint was not viable as to Skanska. As to the plaintiff's claim for quantum meruit or unjust enrichment, set forth in count two of the complaint, the court, referencing and taking judicial notice of the related case of *Semac Electric Co.* v. *Skanska USA Building, Inc.*, Superior Court, judicial district of Hartford, Complex Litigation Docket, Docket No. X07-CV-15-6076107-S (August 23, 2017), aff'd, 195 Conn. App. 695, A.3d (2020) (*Semac*), pointed out that "[t]he record in *Semac* [was] silent on whether Skanska dealt with the plaintiff prior to Semac's breach, directed the plaintiff's performance and knowingly accepted its services, or represented that Skanska [would] compensate the plaintiff for work done." Nonetheless, the court concluded that judgment was appropriate on this count of the plaintiff's complaint because it concluded that

there was no evidence of an implied contract between Skanska and the plaintiff.

As to the bond claim, the court concluded that the defendants' argument that the lienable fund had been exhausted was not compelling, but, relying on *Brian's Floor Covering Supplies, LLC* v. *Spring Meadow Elderly Apartments*, Superior Court, judicial district of Fairfield, Docket No. CV-00-0375810-S (March 22, 2006), concluded that Skanska already had paid Semac for the plaintiff's work, and, therefore, the plaintiff could not recover under the bond. The court, thereafter, rendered judgment in favor of the defendants. This appeal followed.

"In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § [17-45]. . . . Our review of the trial court's decision to grant [a] motion for summary judgment is plenary." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Allstate Ins. Co.* v. *Barron*, 269 Conn. 394, 405–406, 848 A.2d 1165 (2004).

I

The plaintiff claims that the court erred in rendering summary judgment on count two of its complaint because Skanska failed to prove that there exists no issue of material fact on the equitable claim of quantum meruit or unjust enrichment. The plaintiff argues that it sufficiently alleged in its complaint that Skanska knew of and accepted the plaintiff's work, and that this allegation, which has not been rebutted sufficiently by the defendants' evidence, alone demonstrates the existence of an issue of material fact as to whether there was an

implied contract between the plaintiff and Skanska, which would support count two of its complaint sounding in the theories of quantum meruit and unjust enrichment. The plaintiff also argues that the issue of whether Skanska paid Semac in full for the work done by the plaintiff has no bearing on its claims for quantum meruit or unjust enrichment because Semac did not pay the plaintiff, and Skanska accepted the benefit of the plaintiff's work. Skanska argues that the plaintiff's claim sounds only in unjust enrichment, not in quantum meruit, which the plaintiff disputes vigorously in its reply brief. On the merits of the plaintiff's claim, Skanska argues that, because it paid Semac for the work done by the plaintiff, the plaintiff cannot recover from Skanska but must seek its recovery from Semac. We agree with the plaintiff.

"Quantum meruit and unjust enrichment are noncontractual means of recovery in restitution. Quantum meruit is a theory of recovery permitting restitution in the context of an otherwise unenforceable contract. In contrast, recovery under a theory of unjust enrichment applies in the absence of a quasi-contractual relationship. . . . Because both doctrines are restitutionary, the same equitable considerations apply to cases under either theory. The terms of an unenforceable contract will often be the best evidence for restitution of the reasonable value of services rendered in quantum meruit, although sometimes the equities may call for a more restrictive measure. . . . [Our Supreme Court] has used quantum meruit and unjust enrichment interchangeably, or as equivalent terms for recovery in restitution." (Citations omitted.) *Walpole Woodworkers, Inc.* v. *Manning*, 307 Conn. 582, 587 n.9, 57 A.3d 730 (2012).

"Quantum meruit is a theory of contract recovery that does not depend upon the existence of a contract, either express or implied in fact. . . . Rather, quantum meruit arises out of the need to avoid unjust enrichment to a party, even in the absence of an actual agreement. . . . Quantum meruit literally means as much as he has deserved . . . . Centered on the prevention of injustice, quantum meruit strikes the appropriate balance by evaluating the equities and guaranteeing that the party who has rendered services receives a reasonable sum for those services. Unjust enrichment applies whenever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract . . . . Indeed, lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment. Not unlike quantum meruit, it is a doctrine based on the postulate that it is contrary to equity and fairness for a defendant to retain a benefit at the expense of the plaintiff." (Citations omitted; internal quotation marks omitted.) *Gagne* v. *Vaccaro*, 255 Conn. 390, 401, 766 A.2d 416 (2001).

"[A] right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. . . . With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard. . . .

"Unjust enrichment is a very broad and flexible equitable doctrine that has as its basis the principle that it is contrary to equity and good conscience for a defendant to retain a benefit that has come to him at the expense of the plaintiff. . . . The doctrine's three basic requirements are that (1) the defendant was benefited, (2) the defendant unjustly failed to pay the plaintiff for the benefits, and (3) the failure of payment was to the plaintiff's detriment. . . . All the facts of each case must be examined to determine whether the circumstances render it just or unjust, equitable or inequitable, conscionable or unconscionable, to apply the doctrine." (Citations omitted; internal quotation marks omitted.) Id., 408–409.

In the present case, in count two of its complaint, the plaintiff alleges that Skanska is liable to it under the theories of quantum meruit or unjust enrichment. Specifically, the plaintiff alleges in count two that Skanska entered into a contract with the hospital to provide construction services on the project; Skanska entered into a subcontract agreement with Semac to perform electrical work on the project; Semac entered into a second tier subcontract agreement with the plaintiff to perform electrical work on the project; the plaintiff, on October 3, 2015, began to furnish materials and services for the project; *the plaintiff performed services and incurred costs at the request of Skanska*; *Skanska accepted and benefited from the plaintiff's work*; *the plaintiff demanded payment in the amount of $38,509.07 for its services from Skanska*; *and Skanska refused to pay the plaintiff.*

In its motion for summary judgment as to count two of the plaintiff's complaint, Skanska argued that, because it had paid Semac, the party with whom the plaintiff had a written contract, the plaintiff's claims against Skanska were barred. In support of its motion for summary judgment, Skanska relied on the affidavit of Miller and the court's decision in the *Semac* case.

Miller averred in relevant part that in October, 2015, Semac breached its subcontract with Skanska and abandoned the project, requiring Skanska to hire replacement subcontractors to complete the electrical work at an increased cost, which was borne by Skanska and

not by the hospital. Miller further attested that the plaintiff was a second tier subcontractor on the project, and that there existed no contract between Skanska and the plaintiff. In the *Semac* case, the court held that Semac had overbilled Skanska, and it rendered judgment in favor of Skanska and against Semac in the amount of $4,262,390.56. *Semac Electrical Co.* v. *Skanska USA Building, Inc.*, supra, Superior Court Docket No. X07-CV-15-6076107-S. Skanska argues that because it is undisputed that it paid Semac and replacement contractors more than the amount it contractually was required to pay Semac, as a matter of law, it cannot have been unjustly enriched by not paying the plaintiff for any work it performed. We are not persuaded.

The Miller affidavit and the court's decision in the *Semac* case do not speak to the plaintiff's allegations in count two that it began working on the project on October 3, 2015, that it obtained materials and provided services in the amount of $38,509.07 for the project, that it completed its work, that *Skanska accepted and benefited from the plaintiff's work*, that the plaintiff performed services and incurred costs *at the request of Skanska and that Skanska has never paid for the plaintiff's work*.[4] The trial court, in its decision in the *Semac* case, calculated damages due to Skanska based on the court's analysis of the percentage of work completed by Semac compared to how much Semac was paid. Id. The trial court in that case made no finding that Semac had been paid for the work performed by the plaintiff. The lack of such a finding is particularly significant because the court specifically found that Semac had been compensated for the work performed by two other subcontractors. Additionally, as the trial court in the present case stated, it also is unknown whether Skanska "dealt with the plaintiff prior to Semac's breach, directed the plaintiff's performance and knowingly accepted its services, or represented that [it would] compensate the plaintiff for work done."

The fact that Skanska paid replacement electrical contractors more than it was contractually obligated to pay Semac, as averred to by Miller, or overpaid Semac, as found by the trial court in the *Semac* case, says nothing about whether Skanska ever paid Semac or anyone else for the work performed by the plaintiff. Without evidence to the contrary, it is entirely possible that the additional costs incurred by Skanska for electrical work were unrelated to the work performed by the plaintiff. If that is the case, then Skanska was unjustly enriched because it received the benefit of the plaintiff's work without ever paying anyone for it. The court was not in a position to resolve this issue on summary judgment because Skanska failed to present evidence establishing that there was no genuine issue of material fact that it had paid Semac or someone else for the plaintiff's specific services.

The cases relied on by Skanska are consistent with our analysis. In *Providence Electric Co.* v. *Sutton Place, Inc.*, 161 Conn. 242, 245–47, 287 A.2d 379 (1971), our Supreme Court held that the plaintiff subcontractor who had supplied appliances to the general contractor to be installed in apartments in the defendant owner's building could not prevail on a claim of unjust enrichment against the owner because the plaintiff failed to prove that the owner had not paid the general contractor for the appliances. Id. According to the court, "[i]n this case, the plaintiff has clearly demonstrated that [the owner] has derived a benefit: Electrical appliances were installed in its apartments. If, however, [the owner] paid [the general contractor] *for those appliances*, then the enrichment, in the absence of fraud, has not been unjust." (Emphasis added.) Id., 246. The question then is whether the owner, or in this case, Skanska, paid for the precise goods and/or services supplied by the subcontractor. In *Nation Electrical Contracting, LLC* v. *St. Dimitrie Romanian Orthodox Church*, 144 Conn. App. 808, 74 A.3d 474 (2013), this court upheld the trial court's unjust enrichment award to the plaintiff subcontractor because there was sufficient evidence that the defendant owner had not paid the general contractor for the plaintiff's work even though the owner had "paid far in excess of the contract price to complete the project." Id., 818–19. Consequently, Skanska was entitled to summary judgment only if it submitted evidence sufficient to establish that there was no genuine issue of material fact that it paid for the specific work performed by the plaintiff. It failed to do so.

It is the movant's burden at the summary judgment stage to prove that there exists no disputed issue of material fact and that it is entitled to judgment as a matter of law. See, e.g., *Allstate Ins. Co.* v. *Barron*, supra, 269 Conn. 405. The absence of any evidence to refute the plaintiff's allegations that it performed services at the request of Skanska, and that Skanska accepted and benefited from the plaintiff's work because it never paid for that work, creates genuine issues of material fact with respect to the plaintiff's claim for quantum meruit or unjust enrichment.[5] Neither Miller's affidavit nor the court's decision in the *Semac* case, submitted by Skanska in support of its motion for summary judgment on count two of the plaintiff's complaint, addresses these material allegations. Accordingly, the court erred in granting Skanska's motion for summary judgment on count two of the plaintiff's complaint.

## II

The plaintiff next claims that the court erred as a matter of law in rendering summary judgment on count three of its complaint. Specifically, the plaintiff argues that its bond claim is viable under a proper reading of

our mechanic's lien statutes, including §§ 49-33, 49-36, and 49-37.[6] The defendants argue that the court properly granted the motion for summary judgment on the third count of the plaintiff's complaint, but for the wrong reason. Specifically, they argue that they were entitled to judgment as a matter of law on count three of the plaintiff's complaint because the lienable fund was exhausted in completing the project, and there were no funds remaining to give to the plaintiff.[7] We agree with the plaintiff that its claim remains viable.

"Those who provide services or materials in connection with the construction of a building are entitled to claim a lien on the land that they have improved if they fall into one of two categories. Lienors are protected if they have a claim either (1) by virtue of an agreement with or the consent of the owner of the land, or (2) by the consent of some person having authority from or rightfully acting for such owner in procuring labor or materials. General Statutes § 49-33. Lienors in the second category must give timely notice of their intent to claim a lien in order to perfect their lien, while those in the first category need not give such notice. General Statutes § 49-35. Lienors in the second category include subcontractors and persons who furnish materials or services by virtue of a contract with the original contractor or with any subcontractor, that is to say at least first and second tier subcontractors. General Statutes § 49-35. No mechanic's lien may exceed the price which the owner has agreed to pay for the building being erected or improved, and the owner is entitled, furthermore, to credit for payments made in good faith to the original contractor *before receipt of notice of such a lien or liens*. General Statutes §§ 49-33 and 49-36. If the contract price which the owner agreed to pay the original contractor is insufficient to cover all the liens, *claimants other than the original contractor are to be paid first*, and, if necessary, on a pro rata basis. General Statutes § 49-36." (Emphasis added; footnote omitted.) *Seaman* v. *Climate Control Corp.*, 181 Conn. 592, 595–96, 436 A.2d 271 (1980)[8]; see also *ProBuild East, LLC* v. *Poffenberger*, 136 Conn. App. 184, 191–92, 45 A.3d 654 (2012).

"General Statutes § 49-33 establishes a lien in favor of subcontractors by virtue of an agreement with or by consent of the owner of the land upon which the building is being erected . . . . It is well established that [i]t is not necessary to their lien status that [a subcontractor] have any direct contractual relationship either with the owner or with the general contractor . . . . All that is necessary is that the defendant consented to have a building erected on its property and that the lien was for materials or services provided in the erection of said building." (Citations omitted; internal quotation marks omitted.) *Connecticut Carpenters Benefit Funds* v. *Burkhard Hotel Partners II, LLC*, 83 Conn. App. 352, 362, 849 A.2d 922 (2004).

We first address the reasoning set forth by the trial court in rendering summary judgment on the bond claim. The court held that "because Skanska already paid Semac . . . it was not obligated to pay the plaintiff . . . ." But see footnote 4 of this opinion. We disagree with the premise of this holding. Our Supreme Court in *Seaman* v. *Climate Control Corp.*, supra, 181 Conn. 596–97, addressed this precise question and clearly held that, under our mechanic's lien statutes, recovery would not be barred to a second tier subcontractor solely because "the first tier subcontractor with whom they contracted has been paid in full by the general contractor." The trial court, therefore, erred in rendering summary judgment on this ground. We next consider the alternative ground for affirmance raised by the defendants on appeal.

We have examined all of the cases raised by the parties, as well as conducted our own examination of our appellate case law, and we have found nothing factually analogous with the present case. Accordingly, we must determine, as a matter of first impression, whether a lienable fund is exhausted when, *after proper notice* that a subcontractor has filed a mechanic's lien on the property, the property owner continues to pay the general contractor for work on the project until the general contractor has been paid the full contract price. Guided by our General Statutes, relevant legislative history, and our relevant case law, we conclude that when the general contractor *is not in default*, unless there were payments made in bad faith, the lienable fund is the amount still owed by the property owner to the general contractor at the time the property owner receives notice of the lien pursuant to General Statutes § 49-34,[9] regardless of whether it continues to make payments to the nondefaulted general contractor. See General Statutes § 49-36 (c) (in determining amount of lienable fund, property owner allowed credit for whatever good faith payments it has made to general contractor *before it received notice of lien*); see generally General Statutes § 49-35 (regarding subcontractor's notice of intent);[10] *H & S Torrington Associates* v. *Lutz Engineering Co.*, 185 Conn. 549, 555, 441 A.2d 171 (1981) (subcontractor or materialman may give property owner § 49-35 notice of intent prior to recording mechanic's lien certificate or may give notice under §§ 49-34 and 49-35 with service of lien certificate; two separate notices not required).[11]

Although, as noted previously in this opinion, neither this court nor our Supreme Court has addressed the precise issue before us, certain decisions by our Supreme Court interpreting the relevant statutes at issue in this case inform our analysis. We start with our Supreme Court's decision in *Seaman*, a case quite similar in many respects to the present case, and one relied on by all parties on appeal. In *Seaman*, the plain-

tiff, who was the property owner, contracted with a general contractor to construct apartment style housing. *Seaman* v. *Climate Control Corp.*, supra, 181 Conn. 593. The general contractor then entered into a subcontract agreement for the installation of plumbing equipment on the project, and the subcontractor, thereafter, entered into two second tier subcontract agreements, one with a supplier and one with a servicer. Id., 593–94. The second tier subcontractors, who were the defendants in the case, had no contractual relationship with the plaintiff or the general contractor, and their work was not directed or controlled by either of them. Id., 594. The general contractor had paid the subcontractor nearly the full amount of its subcontract price when the subcontractor defaulted and walked off the job. Id., 594 and n.3. Although having been paid by the general contractor, the subcontractor had not paid the defendants. Id., 594–95. The defendants notified the property owner of their intention to file a mechanic's lien; at that time, the property owner still owed the general contractor $89,157, with an additional cost of $8005.91 to complete the work left unfinished by the defaulting subcontractor. Id., 594. The defendants each filed a mechanic's lien, one in the amount of $40,697.66 and the other in the amount of $7702, the total of which was "substantially less than the amount remaining due . . . to the general contractor . . . ." Id., 595. The parties thereafter stipulated that the $7702 amount should be $6526. Id. Unlike the hospital in the present case, the property owner in *Seaman* did not pay the general contractor the outstanding balance he owed, but, rather, he retained that money after receiving notice of the liens. Id., 596.

Our Supreme Court explained in *Seaman*: "The subcontractors, even though they are second tier rather than first tier subcontractors, are prima facie within the ambit of the mechanic's lien law. It is not necessary to their lien status that they have any direct contractual relationship either with the owner or with the general contractor (denominated the original contractor in the statutes). They have concededly given timely notice to the owner, in proper form, of their liens. There is an identifiable fund which appropriate claims for mechanic's liens may reach, since the owner has retained an unpaid balance due under his contract with the general contractor that exceeds in amount the totality of the mechanic's lien claims." Id. Our Supreme Court then explained that the defendants, which were second tier subcontractors, were not barred from recovery on their liens simply because the first tier subcontractor, with whom they had contracted, had been paid in full by the general contractor. Id., 596–97.

Our Supreme Court then set forth its analysis of § 49-33: "In interpreting this section, the complexity of which should not be underestimated . . . we are guided by [well settled] principles of construction. Although the

mechanic's lien law creates a statutory lien in derogation of the common law, its remedial purpose to furnish security for a contractor's labor and materials requires a generous construction. . . . Even bearing in mind the statute's beneficent purpose, we are, however, constrained by the language of the statute as we find it, and cannot rewrite the statute or adopt the reasoning of precedents in other jurisdictions with different statutes. . . .

"Two sentences in § 49-33 are central to the arguments of the parties. '[A] mechanic's lien shall [not] attach to any . . . building . . . in favor of any subcontractor to a greater extent in the whole than the amount which the owner has agreed to pay to any person through whom [the] subcontractor claims . . . . [General Statutes § 49-33 (e).] Any such subcontractor shall be subrogated to the rights of the person through whom such subcontractor claims . . . .' [General Statutes § 49-33 (f).] The plaintiff urges that the second sentence subrogates the second tier subcontractor to the rights of the first tier subcontractor while the defendants claim to be subrogated to the rights of the general contractor. These disparate interpretations are crucial to this appeal, since the first tier subcontractor, having been fully paid, has no right to which anyone could be subrogated, while the general contractor, as yet partially unpaid, remains a suitable candidate for subrogation. The parties are at odds both about the significance of the exact wording of § 49-33 and about its relationship to our existing case law." (Citations omitted; footnote omitted.) Id., 597–99. The court explained that a second tier subcontractor is subrogated to the rights of the general contractor when the first tier subcontractor defaults after having been paid, leaving unpaid the second tier subcontractor. Id., 603–604. Our Supreme Court explained that it is significant that under our legislative scheme "all subcontractors are preferred to the general contractor if the lienable fund is inadequate to cover [all] outstanding claims."[12] Id., 605; see General Statutes § 49-36. When considering the plaintiff's argument in *Seaman* that the court's construction of § 49-33 would result in the "unjust enrichment of second tier subcontractors," our Supreme Court stated the following: "How the risk of defaulting first tier subcontractors should be allocated between the owner and the general contractor is not an issue presently before us, although we observe that contractors generally are deemed to make a number of implied warranties, including the warranty that there are no outstanding liens. Cf. Uniform Commercial Code §§ 2-312 and 3-417, General Statutes §§ 42a-2-312 and 42a-3-417."[13] Id., 606.

The significant difference between the facts in *Seaman* and the facts in the present case is that the property owner in *Seaman*, after he received notice of the second tier subcontractors' liens, retained the balance

due to the nondefaulted general contractor, whereas, in the present case, the hospital, after it received notice of the plaintiff's lien, continued to make payments to the nondefaulted general contractor, Skanska. The defendants argue that, pursuant to the language in §§ 49-33 (e) and (f) and 49-36, this fact makes all the difference because the lienable fund became exhausted when the hospital paid the full contract price to Skanska.

In support of this argument, the defendants principally rely on our Supreme Court's decision in *Rene Dry Wall Co.* v. *Strawberry Hill Associates*, 182 Conn. 568, 438 A.2d 774 (1980). In that case, the plaintiff subcontractor sought to foreclose a mechanic's lien held against the defendant owner whose property was improved by the plaintiff's work. Id., 569. The defendant argued that it was excused from the obligation to pay the plaintiff because of good faith payments made to the general contractor before notice of the plaintiff's lien and "because of expenditures reasonably incurred to complete the construction project after the general contractor's default." Id. The court concluded that the issues in the case were framed by the relevant statutory provisions regarding mechanic's liens. In particular, the court held that "General Statutes §§ 49-33 and 49-36 . . . define and delimit the fund to which a properly noticed mechanic's lien may attach. Both of these sections start with the proposition that no mechanic's lien may attach to any building or land in an amount greater than the price which the owner has agreed to pay to the general contractor for the building being erected or improved. This amount may be diminished to the extent that it exceeds 'the reasonable cost . . . of satisfactory completion of the contract plus any damages resulting from . . . default for which [the general contractor] might be held liable to the owner.' General Statutes § 49-33. The amount may be diminished further by 'bona fide payments, as defined in section 49-36, made by the owner [to the general contractor] before receiving notice of [the mechanic's] lien or liens.' " (Footnotes omitted.) Id., 571–72.[14]

The defendants argue that, applying the reasoning of *Rene Dry Wall Co.*, the plaintiff cannot collect on the bond because the combination of the amounts paid by the hospital in good faith prior to notice of the plaintiff's lien and the amounts paid to Skanska to complete the construction project equal the amount the hospital agreed to pay for the project. Thus, they argue, there is no lienable fund available to the plaintiff. The plaintiff argues in response that *Rene Dry Wall Co.* is distinguishable and inapplicable to this case because Skanska was never in default of its contract with the hospital. According to the plaintiff, pursuant to § 49-33, an owner is entitled to credits against the lienable fund only for payments made after notice of a subcontractor's lien when it is required to make such payments because of the general contractor's default. We agree with the

plaintiff.

Section 49-33 provides in relevant part: "(e) A mechanic's lien shall not attach . . . in favor of any subcontractor to a greater extent in the whole than the amount which the owner has agreed to pay to any person through whom the subcontractor claims subject to the provisions of section 49-36.

"(f) Any such subcontractor shall be subrogated to the rights of the person through whom the subcontractor claims, except that the subcontractor shall have a mechanic's lien or right to claim a mechanic's lien in the event of any default by that person subject to the provisions of sections 49-34, 49-35 and 49-36, provided the total of such lien or liens shall not attach . . . to a greater amount in the whole than the amount by which the contract price between the owner and the person through whom the subcontractor claims exceeds the reasonable cost, either estimated or actual, as the case may be, of satisfactory completion of the contract plus any damages resulting from such default for which that person might be held liable to the owner and all bona fide payments, as defined in section 49-36, made by the owner before receiving notice of such lien or liens."

Section 49-36 provides in relevant part: "(a) No mechanic's lien may attach . . . to a greater amount in the whole than the price which the owner agreed to pay for the building and its appurtenances or the development of any such lot, or the development of any such plot of land. . . .

"(c) In determining the amount to which any lien or liens may attach . . . the owner of the [property] . . . shall be allowed whatever payments he has made, in good faith, to the original contractor or contractors, *before receiving notice of the lien or liens*. No payments made in advance of the time stipulated in the original contract may be considered as made in good faith, unless notice of intention to make the payment has been given in writing to each person known to have furnished materials or rendered services at least five days before the payment is made." (Emphasis added.)

The plaintiff argues that, under a proper reading of these statutes, when the general contractor *is not in default*, the lienable fund must be determined at the time the lien is filed and notice given to the property owner. The defendants argue that the plaintiff's interpretation of the statutes "would create a perverse incentive by encouraging property owners to terminate the general contractor when a subcontractor gives notice of a lien in order to take advantage of the reduction for the cost to complete the work. In other words, because [the plaintiff's] interpretation of the statute[s] would permit the lienable fund to be reduced when the general contractor defaults or is terminated, a property owner who otherwise had no intention to terminate the

general contractor may do so after receiving notice of a lien in order to reduce the amount available to the lienor." The defendants contend that the plain language of § 49-33 (f) "provides that the lienable fund is reduced by the cost to complete the contract, and that reduction applies whether or not the general contractor defaults."

During oral argument before this court, the plaintiff explained that it believed that the defendants' construction of our statutory scheme regarding mechanic's liens would lead to absurd results because a lien or a bond, specifically meant to protect the subcontractors, including second tier subcontractors, would be useless because a nondefaulted general contractor, after a properly noticed lien had been filed by a subcontractor, could get paid fully, including profit, thereby exhausting the fund, and the subcontractors would be left with no secured claim, despite their preference in the statute. During questioning by the appellate panel, this court asked Skanska's counsel whether a nondefaulted general contractor essentially could just ask for full payment from the property owner in exchange for bonding off every subcontractor lien, including second tier subcontractors, thereby reducing the lienable fund to zero and avoiding the preference in the statutes in favor of the subcontractors. Skanska's counsel responded that the second tier subcontractors still could bring a claim against the party with whom they had a written contract, and, he argued, if the situation were similar to the present case, where "there's a bad actor sub[contractor, then] somebody gets the short end of the stick . . . ." We conclude that the defendants' construction of our statutes is not only inconsistent with the language of the statutes, but it would lead to absurd results, inconsistent with the legislative purpose of those statutes.

Although in derogation of the common law, the remedial purpose of § 49-33 is to "furnish security for a contractor's labor and materials . . . ." *Seaman* v. *Climate Control Corp.*, supra, 181 Conn. 597. Pursuant to §§ 49-33 and 49-36, the amount of a mechanic's lien may not exceed the price that the property owner has agreed to pay for the building being erected or improved, and the property owner is entitled to credit for payments it made in good faith to the general contractor *before receipt of notice of such a lien*. See id., 596. If the contract price that was agreed on by the general contractor and the property owner is insufficient to cover all the liens, "claimants *other than the original contractor* are to be paid first, and, if necessary, on a pro rata basis." (Emphasis added.) Id.; see General Statutes § 49-36 (b). "[A]ll subcontractors are preferred to the general contractor if the lienable fund is inadequate to cover outstanding claims." Id., 605. "[I]f the owner still owes money to the general contractor *when a second-tier subcontractor files a mechanic's lien*, the second-tier subcontractor can seek recovery from the owner even where the general contractor has made full payment to

the first-tier subcontractor who hired the second-tier subcontractor." (Emphasis added.) D. Rosengren, 13 Connecticut Practice Series: Construction Law (2005) § 6:2, p. 125.

"In [General Statutes (1918 Rev.) §] 5220 [(now § 49-36)], the opening provision clearly applies to all mechanics' liens by whomsoever held, and provides that they shall not exceed the total which the owner was to pay under his contract. It then explicitly provides that *the contractor's own lien shall be subordinated to those of subcontractors, entitling them to payment before him*, and if the available fund does not pay the subcontractor liens in full, the fund must be apportioned between them. The subcontractor's right to a lien, though inchoate comes into existence when he begins furnishing materials . . . *and becomes perfected when he files his lien* having complied with all statutory requirements. These rights which are given the subcontractor cannot be taken from him or abridged by act of the contractor or the owner." (Citation omitted; emphasis added; internal quotation marks omitted.) *Purcell, Inc.* v. *Libbey*, 111 Conn. 132, 137, 149 A. 225 (1930).

The defendants contend that older case law is not controlling because there was an important change in our statutes that occurred in 1953; see Public Acts 1953, No. 502, § 1; that modified what is now § 49-33. They contend that No. 502 of the 1953 Public Acts "add[ed] the language in what is now . . . § 49-33 (f) providing that the amount available to subcontractors is reduced by the 'reasonable cost . . . of satisfactory completion of the contract . . .' " and that this language applies "whether or not the general contractor defaults." The legislative history of No. 502 of the 1953 Public Acts does not support the defendants' position.

In 1953, the House of Representatives introduced House Bill No. 1733, 1953 Sess., which ultimately became No. 502 of the 1953 Public Acts, modifying General Statutes (Cum. Supp. 1951) § 1273b (formerly General Statutes (1949 Rev.) § 7217), now § 49-33. In 1953, the legislature added the language, "except that such subcontractor shall have such a lien or right to claim such a lien in the event of any default by such person . . . provided the total of such lien or liens shall not attach . . . to a greater amount in the whole than the amount by which the contract price between the owner and such person exceeds the reasonable cost . . . of satisfactory completion of the contract plus any damages resulting from such default for which such person might be held liable to the owner and all bona fide payments . . . made by the owner before receiving notice of such liens or liens"; see No. 502 of the 1953 Public Acts; which remains a part of § 49-33 today, specifically, § 49-33 (f). The defendants contend that the legislature meant this language to apply even when

the general contractor is not in default. The plaintiff contends that this language applies *only* when the general contractor is in default. In light of the legislative history of No. 502 of the 1953 Public Acts and the purpose for which it was enacted, we agree with the plaintiff.

House Bill No. 1733 was introduced to correct a statutory problem that was uncovered by our Supreme Court in *Rowley* v. *Salladin*, 139 Conn. 642, 96 A.2d 219 (1953). In *Rowley*, the general contractor had abandoned the project without paying the subcontractor, who then filed a mechanic's lien. Id., 644. The property owner argued that the subcontractor had no right to the lien because, pursuant to General Statutes (Cum. Supp. 1951) § 1273b (now § 49-33), the subcontractor was subrogated only to the rights of the general contractor, who had no right to a lien because he had defaulted. Id. After construing the plain language of the statute, our Supreme Court agreed. Id., 644–45.

In response to *Rowley*, members of the legislature introduced House Bill No. 1733. Representative Kenyon W. Greene, in moving for acceptance of the bill, explained that it was introduced to "provid[e] [that] the subcontractor's right of [a] mechanic's lien shall not be lost by default of the general contractor . . . ." 5 H.R. Proc., Pt. 8, 1953 Sess., pp. 3313–14; see also Conn. Joint Standing Committee Hearings, Judiciary, Pt. 3, 1953 Sess., pp. 760–63. Thus, what is now § 49-33 was amended to ensure that an owner could not use a general contractor's default as an excuse not to pay a subcontractor for work that benefitted the owner. At the same time, the amendment protected the owner who was forced to incur additional costs due to the general contractor's default. There simply is nothing in the language or legislative history of the 1953 amendment that suggests that an owner is entitled to take credit for payments made to a general contractor not in default after having received notice of the subcontractor's lien. In fact, such an interpretation would run contrary to the 1953 amendment's intent to provide greater protection to subcontractors.

Prior to the 1953 amendment to what is now § 49-33, the only amounts the owner was entitled to credit against the lienable fund were "whatever payments he shall have made, in good faith, to the [general] contractor or contractors before receiving notice of such lien or liens." General Statutes (1949 Rev.) § 7220. The 1953 amendment gave the owner an additional credit for any funds it had to pay after notice of the subcontractor's lien, *due to the general contractor's default*. Such protection for the owner makes sense because, once the general contractor defaults, the owner would be forced to find someone else to complete the project and would be required to pay that third party for their work. Under that specific circumstance, the legislature chose to

place the risk of the defaulting general contractor on the subcontractor and not the owner, to the extent the owner's costs of completing the construction project equaled or exceeded the amount he had contracted to pay the general contractor. However, where the general contractor is not in default, there is no need to protect the owner by permitting it to continue to pay the general contractor at the expense of subcontractors who have filed valid mechanic's liens on the owner's property. The owner need only withhold payments from the general contractor until the subcontractor's mechanic's liens are resolved. There is no third party who was previously a stranger to the construction project that must be compensated for its work. In such a circumstance, the risk of not getting paid properly is placed on the general contractor, consistent with the preference in favor of subcontractors expressly set forth in § 49-36 (b). Put another way, expanding the language of § 49-33 to payments made when the general contractor is not in default, as suggested by the defendants, would eviscerate the protections provided to subcontractors in § 49-36 (b) and (c).

Furthermore, the defendants' interpretation of the relevant statutes would lead to absurd results in that it would permit an owner and a general contractor to render a subcontractor's lien essentially meaningless. The facts of this case show exactly how such a result can be accomplished. It is undisputed that at the time the plaintiff filed its mechanic's lien there were more than sufficient funds still unpaid by the hospital to Skanska to cover the plaintiff's claim. Rather than withholding money from Skanska to pay any amounts duly owed to the plaintiff pursuant to its lien, the hospital paid the full contract amount to Skanska. Under the defendants' interpretation of § 49-33, doing so wiped out the lienable fund, and, with it, the plaintiff's lien, and *created a preference in favor of the general contractor at the expense of a subcontractor.* Not only is there nothing in the language or legislative history of § 49-33 that remotely suggests such a result; the result is flatly contrary to the preference in favor of subcontractors set forth in § 49-36 (b). We cannot conclude that the legislature intended a result that is so completely at odds with the remedial purpose of the mechanic's lien statutes.

Finally, the defendants' claim that the plaintiff's reading of §§ 49-33 and 49-36 would lead to the perverse result that owners would be incentivized to find a reason to hold general contractors in default makes little sense. According to the defendants, an owner who has received notice of a mechanic's lien from a subcontractor would be motivated to manufacture a default by the general contractor in order to terminate the general contractor in order to reduce the size of the lienable fund available to the subcontractor. There are several problems with this hypothesis. First, it ignores what could be significant transaction costs the owner would

incur by replacing a performing contactor with a new contractor unfamiliar with the project. Second, it ignores the fact that, by engaging in such conduct, the owner would expose itself to liability to the general contractor for breach of contract. Third, to the extent the owner concluded that it would be profitable to breach its contract with the general contractor, whether a subcontractor filed a mechanic's lien likely would not change that conclusion. Finally, the defendants have not described a precise scenario that would lead an owner to manufacture a default by the general contractor, and we cannot think of a scenario in which the owner would not be acting against its economic interest by terminating the general contractor simply to reduce the amount available to a subcontractor lienor. The amount available to the subcontractor lienor would only be reduced to the extent that the owner paid an amount equal to or greater than its contract price with the defaulted general contractor. It would defy logic for an owner to terminate a general contractor just so it can incur more costs to avoid paying the subcontractor lienor.

On the basis of the foregoing analysis, we conclude that the lienable fund was the amount owed by the hospital to Skanska at the time the plaintiff gave notice of its mechanic's lien to the hospital in accordance with §§ 49-34 and 49-35. Accordingly, the defendants' alternative ground for affirmance fails.

The judgment is reversed with respect to counts two and three of the plaintiff's complaint, and the case is remanded to the trial court for further proceedings according to law; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The plaintiff withdrew the matter as to the named defendant, The Stamford Hospital. Fidelity is the surety that issued a bond in substitution for the mechanic's lien that the plaintiff had filed against the hospital. See General Statutes §§ 49-33 and 49-37.

[2] Semac Electrical Company, Inc. (Semac), also is a defendant in this matter. Although Semac initially had appeared by counsel in the trial court, the court, on December 12, 2017, granted counsel's motion for permission to withdraw its appearance. No further action appears to have been taken against Semac, who now is a nonappearing defendant, and the matter remains pending as to Semac in the trial court. For purposes of this appeal, we refer to Skanska and Fidelity as the defendants unless further clarification is necessary.

[3] The court also rendered summary judgment in favor of Skanska as to count one of the plaintiff's complaint, which alleged that Skanska had breached a contract with the plaintiff. The plaintiff does not challenge that judgment in this appeal. Thus, we affirm the judgment in favor of Skanska as to count one.

[4] Although Skanska had alleged in its answer that it fully had paid Semac for the plaintiff's work, Miller made no such attestation in his affidavit. In fact, he averred that "[t]he total amount paid to the replacement electrical contractors exceeded *the remaining amount* of the original subcontract with Semac." (Emphasis added.)

[5] Because we conclude that there is a genuine issue of material fact as to whether Skanska ever paid for the plaintiff's services, we need not address whether the plaintiff could prevail on its claim in the event that Skanska fully had paid Semac for the plaintiff's work, if the plaintiff proves that Skanska, despite such payment, had requested that the plaintiff continue

performing work on the project. We also need not determine whether there are additional issues of material fact that rendered summary judgment inappropriate.

[6] General Statutes § 49-33 provides in relevant part: "(a) If any person has a claim for more than ten dollars for materials furnished or services rendered in the construction, raising, removal or repairs of any building or any of its appurtenances or in the improvement of any lot or in the site development or subdivision of any plot of land, and the claim is by virtue of an agreement with or by consent of the owner of the land upon which the building is being erected or has been erected or has been moved, or by consent of the owner of the lot being improved or by consent of the owner of the plot of land being improved or subdivided, or of some person having authority from or rightfully acting for the owner in procuring the labor or materials, the building, with the land on which it stands or the lot or in the event that the materials were furnished or services were rendered in the site development or subdivision of any plot of land, then the plot of land, is subject to the payment of the claim. . . .

"(e) A mechanic's lien shall not attach to any such building or its appurtenances or to the land on which the same stands or to any lot or to any plot of land, in favor of any subcontractor to a greater extent in the whole than the amount which the owner has agreed to pay to any person through whom the subcontractor claims subject to the provisions of section 49-36.

"(f) Any such subcontractor shall be subrogated to the rights of the person through whom the subcontractor claims, except that the subcontractor shall have a mechanic's lien or right to claim a mechanic's lien in the event of any default by that person subject to the provisions of sections 49-34, 49-35 and 49-36, provided the total of such lien or liens shall not attach to any building or its appurtenances, or to the land on which the same stands or to any lot or to any plot of land, to a greater amount in the whole than the amount by which the contract price between the owner and the person through whom the subcontractor claims exceeds the reasonable cost, either estimated or actual, as the case may be, of satisfactory completion of the contract plus any damages resulting from such default for which that person might be held liable to the owner and all bona fide payments, as defined in section 49-36, made by the owner before receiving notice of such lien or liens. . . ."

General Statutes § 49-36 provides in relevant part: "(a) No mechanic's lien may attach to any building or its appurtenances, or to the land on which the same stands, or any lot, or any plot of land, in favor of any person, to a greater amount in the whole than the price which the owner agreed to pay for the building and its appurtenances or the development of any such lot, or the development of any such plot of land. . . .

"(c) In determining the amount to which any lien or liens may attach upon any land or building, or lot or plot of land, the owner of the land or building or lot or plot of land shall be allowed whatever payments he has made, in good faith, to the original contractor or contractors, before receiving notice of the lien or liens. No payments made in advance of the time stipulated in the original contract may be considered as made in good faith, unless notice of intention to make the payment has been given in writing to each person known to have furnished materials or rendered services at least five days before the payment is made."

General Statutes § 49-37 provides in relevant part: "(a) Whenever any mechanic's lien has been placed upon any real estate pursuant to sections 49-33, 49-34 and 49-35, the owner of that real estate, or any person interested in it, may make an application to any judge of the Superior Court that the lien be dissolved upon the substitution of a bond with surety, and the judge shall order reasonable notice to be given to the lienor of the application. . . ."

[7] Pursuant to Practice Book § 63-4, Skanska and Fidelity submitted this argument as an alternative ground for affirmance.

[8] We note that the lien statutes referenced in *Seaman* v. *Climate Control Corp.*, supra, 181 Conn. 592, are from the 1979 revision of the General Statutes. Although several of those statutes have been amended by the legislature since our Supreme Court's decision in *Seaman*, those amendments have no bearing on the merits of this appeal.

[9] General Statutes § 49-34 provides: "A mechanic's lien is not valid unless the person performing the services or furnishing the materials (1) within ninety days after he has ceased to do so, lodges with the town clerk of the town in which the building, lot or plot of land is situated a certificate in writing, which shall be recorded by the town clerk with deeds of land, (A)

describing the premises, the amount claimed as a lien thereon, the name or names of the person against whom the lien is being filed and the date of the commencement of the performance of services or furnishing of materials, (B) stating that the amount claimed is justly due, as nearly as the same can be ascertained, and (C) subscribed and sworn to by the claimant, and (2) not later than thirty days after lodging the certificate, serves a true and attested copy of the certificate upon the owner of the building, lot or plot of land in the same manner as is provided for the service of the notice in section 49-35."

[10] General Statutes § 49-35 provides in relevant part: "(a) No person other than the original contractor . . . or a subcontractor whose contract with the original contractor is in writing and has been assented to in writing by the other party to the original contract, is entitled to claim any such mechanic's lien, unless, after commencing, and not later than ninety days after ceasing, to furnish materials or render services for such construction . . . such person gives written notice to the owner of the building, lot or plot of land and to the original contractor that he or she has furnished or commenced to furnish materials, or rendered or commenced to render services, and intends to claim a lien therefor on the building, lot or plot of land; provided an original contractor shall not be entitled to such notice, unless, not later than fifteen days after commencing the construction . . . such original contractor lodges with the town clerk of the town in which the building, lot or plot of land is situated an affidavit in writing, which shall be recorded by the town clerk with deeds of land, (1) stating the name under which such original contractor conducts business, (2) stating the original contractor's business address, and (3) describing the building, lot or plot of land. . . .

"(b) No subcontractor, without a written contract complying with the provisions of this section, and no person who furnishes material or renders services by virtue of a contract with the original contractor or with any subcontractor, may be required to obtain an agreement with, or the consent of, the owner of the land, as provided in section 49-33, to enable him to claim a lien under this section."

[11] Our Supreme Court explained in *H & S Torrington Associates* that the enactment of the notice requirement set forth in § 49-34 "was intended to protect the due process rights of property owners who would not otherwise have actual notice of the recorded lien." *H & S Torrington Associates* v. *Lutz Engineering Co.*, supra, 185 Conn. 554. It also explained that the enactment of the notice requirement set forth in § 49-35 "was concerned with the protection of the owner of the property, who might not otherwise know what, if any, subcontractors the principal contractor had employed . . . *so that payments to the main contractor may be withheld* . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.) Id. A subcontractor may satisfy simultaneously in one document the notice requirements of both §§ 49-34 and 49-35. Id., 555. "Two separate notices are not necessary to accomplish the purpose of the statutes." Id.

[12] The legislature's desire to protect the rights of subcontractors, further is demonstrated by the enactment of NO. 99-153 of the 1999 Public Acts (P.A. 99-153), codified at General Statutes § 42-158*l*. In § 4 of P.A. 99-153, the legislature "placed substantial restrictions on a party's right to include lien waivers in construction contracts." D. Rosengren, 13 Connecticut Practice Series: Construction Law (2005) § 6:8, p. 140. Furthermore, "it is well settled that the general contractor cannot bargain away the lien rights of subcontractors and materialmen who: (1) are not themselves privy to the general contractor's agreement containing the waiver; (2) do not agree with the general contractor to waive their lien right; or (3) do not adopt the lien waiver provision as incorporated in the contract between the general contractor and the owner." Id., pp. 141–42.

Subsection (a) of § 42-158*l* provides: "Any provision in a construction contract or any periodic lien waiver issued pursuant to a construction contract that purports to waive or release the right of a contractor, subcontractor or supplier engaged to perform services, perform labor or furnish materials under the construction contract to (1) claim a mechanic's lien, or (2) make a claim against a payment bond, for services, labor or materials which have not yet been performed and paid for shall be void and of no effect."

[13] General Statutes § 42a-2-312 provides: "(1) Subject to subsection (2) there is in a contract for sale a warranty by the seller that (a) the title conveyed shall be good, and its transfer rightful; and (b) the goods shall be delivered free from any security interest or other lien or encumbrance of which the buyer at the time of contracting has no knowledge.

"(2) A warranty under subsection (1) will be excluded or modified only by specific language or by circumstances which give the buyer reason to know that the person selling does not claim title in himself or that he is purporting to sell only such right or title as he or a third person may have.

"(3) Unless otherwise agreed a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like but a buyer who furnishes specifications to the seller must hold the seller harmless against any such claim which arises out of compliance with the specifications."

General Statutes § 42a-3-417, as amended by No. 91-304 of the 1991 Public Acts, provides: "(a) If an unaccepted draft is presented to the drawee for payment or acceptance and the drawee pays or accepts the draft, (i) the person obtaining payment or acceptance, at the time of presentment, and (ii) a previous transferor of the draft, at the time of transfer, warrant to the drawee making payment or accepting the draft in good faith that: (1) The warrantor is, or was, at the time the warrantor transferred the draft, a person entitled to enforce the draft or authorized to obtain payment or acceptance of the draft on behalf of a person entitled to enforce the draft; (2) the draft has not been altered; and (3) the warrantor has no knowledge that the signature of the drawer of the draft is unauthorized.

"(b) A drawee making payment may recover from any warrantor damages for breach of warranty equal to the amount paid by the drawee less the amount the drawee received or is entitled to receive from the drawer because of the payment. In addition, the drawee is entitled to compensation for expenses and loss of interest resulting from the breach. The right of the drawee to recover damages under this subsection is not affected by any failure of the drawee to exercise ordinary care in making payment. If the drawee accepts the draft, breach of warranty is a defense to the obligation of the acceptor. If the acceptor makes payment with respect to the draft, the acceptor is entitled to recover from any warrantor for breach of warranty the amounts stated in this subsection.

"(c) If a drawee asserts a claim for breach of warranty under subsection (a) based on an unauthorized endorsement of the draft or an alteration of the draft, the warrantor may defend by proving that the endorsement is effective under section 42a-3-404 or 42a-3-405 or the drawer is precluded under section 42a-3-406 or 42a-4-406 from asserting against the drawee the unauthorized endorsement or alteration.

"(d) If (i) a dishonored draft is presented for payment to the drawer or an endorser or (ii) any other instrument is presented for payment to a party obliged to pay the instrument, and (iii) payment is received, the following rules apply: (1) The person obtaining payment and a prior transferor of the instrument warrant to the person making payment in good faith that the warrantor is, or was, at the time the warrantor transferred the instrument, a person entitled to enforce the instrument or authorized to obtain payment on behalf of a person entitled to enforce the instrument. (2) The person making payment may recover from any warrantor for breach of warranty an amount equal to the amount paid plus expenses and loss of interest resulting from the breach.

"(e) The warranties stated in subsections (a) and (d) cannot be disclaimed with respect to checks. Unless notice of a claim for breach of warranty is given to the warrantor within thirty days after the claimant has reason to know of the breach and the identity of the warrantor, the liability of the warrantor under subsection (b) or (d) is discharged to the extent of any loss caused by the delay in giving notice of the claim.

"(f) A cause of action for breach of warranty under this section accrues when the claimant has reason to know of the breach."

[14] We note that § 49-33, referenced in *Rene Dry Wall Co.* v. *Strawberry Hill Associates*, supra, 182 Conn. 568, is from the 1979 revision of the General Statutes. Although § 49-33 has been amended by the legislature since our Supreme Court's decision in *Rene Dry Wall Co.*, those amendments have no bearing on the merits of this appeal.